**UNITED STATES of America, Plaintiff,**

v.

**$87,375 IN UNITED STATES CURRENCY, Defendant.**

Civ. A. No. 88–82.

United States District Court, D. New Jersey.

Dec. 14, 1989.

**156**

Kevin McKenna, Asst. U.S. Atty., Newark, N.J., for plaintiff.

Bonnie Phillips, Coconut Grove, Fla. and Mark Mungello, Clementon, N.J., for defendant.

## OPINION

GERRY, Chief Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff United States has brought this case under 21 U.S.C. § 881 against the defendant property, $87,375 in United States Currency. The United States has alleged that the defendant property is traceable in some way to a transaction involving controlled substances in violation of Title 21 of the U.S.Code. The claimants to the defendant property are citizens of Colombia, Juan Ricardo Camacho and Maria Clara Echavarria.

A bench trial was heard in this court on May 15, 1989, and the court now issues the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT

On February 12, 1987, at approximately 8:00 p.m., New Jersey State Trooper John Tomasello stopped a white 1987 Chevrolet with Florida license plates going westbound on U.S. Route 40 in Carney's Point, Salem County, New Jersey. Trooper Tomasello stopped the car after determining that it had been travelling 63 miles per hour in a 50 miles per hour zone. The driver of the car was the claimant, Juan Ricardo Camacho, a native of Colombia who was then residing in Miami, Florida. Mr. Camacho produced a valid Florida driver's license but failed to produce a rental agreement for the car which he was driving at the time of the stop. He did produce a rental agreement but it pertained to a Toyota.

Mr. Camacho told Trooper Tomasello that he was a professional tennis player, and that he was on his way from New York to Miami. Trooper Tomasello observed that Mr. Camacho appeared to be nervous.

Trooper Tomasello also observed an opened suitcase on the back seat of the car. After the trooper's request, Mr. Camacho consented to a search of the car. Trooper Tomasello provided Mr. Camacho with a New Jersey State Police Consent to Search Form and advised Mr. Camacho that he had the right to refuse to consent to the search. While seated in the back seat of the trooper's patrol car, Mr. Camacho voluntarily executed the consent form.

Upon his search of the car, Trooper Tomasello observed a pillow case protruding out of the suitcase on the back seat. The trooper directed his flashlight on the pillow case and observed bundles of United States currency through the semi-opaque fabric. An inspection of the pillow case revealed a quantity of money consisting of small denomination bills of varying ages and conditions which were secured in bundles by rubber bands. At that point, Trooper Tomasello advised Mr. Camacho of his *Miranda* rights and then questioned Mr. Camacho about the currency.

Mr. Camacho told the trooper that the currency belonged to his brother and was going to be used to purchase an apartment in Florida. Mr. Camacho said that he had obtained the currency at an airport in New York from a person he had never met before. Mr. Camacho said that this person walked with him to his car, deposited the money in the car's trunk and left.

After these disclosures by the claimant, Trooper Tomasello handcuffed Mr. Camacho and transported him to the New Jersey State Police barracks in Woodstown, New Jersey for further questioning. Arrangements were made to have Mr. Camacho's car brought to the Woodstown barracks. Subsequently, the New Jersey State Police contacted the United States Customs Service and requested its assistance with the investigation. Customs Special Agents Richard Stingle, Julio Velez and Joseph Wayno, and Canine Enforcement Officer Ronald Eichmann, along with his narcotics detector dog, Coco, responded to the State Police's request.

Prior to this investigation in February 1987, Officer Eichmann had worked with Coco for approximately seven years. Coco completed the narcotics detection training program for canines at the Custom Service's facility in Front Royal, Virginia in 1980. Coco also demonstrated her proficiency in narcotics detection in annual recertification exercises between 1980 and 1987.

Officer Eichmann was asked to have Coco examine the trooper's locker room at the Woodstown barracks for the presence or odor of a controlled substance. Officer Eichmann first took Coco on a "control run" or a "sterile run" of the locker room by leading her around the perimeter and past the lockers and chests of drawers. On the "control run," Coco did not alert to anything. Officer Eichmann and Coco then left the locker room, and the pillowcase with the currency which was found in Mr. Camacho's car was hidden in a locker room chest of drawers. Upon her return to the locker room, Coco alerted almost instantly to the presence or odor of a controlled substance in the chest of drawers containing the pillowcase and currency. A similar search was conducted in Mr. Camacho's car and Coco alerted to the presence or odor of a controlled substance on the back seat, where the suitcase had been.

After these searches, the bundles of currency were opened and the money counted. There were 7,635 bills in $1, $5, $10 and $20 denominations totalling $87,375.00. A master list setting forth the serial numbers and denominations of the bills in each of the seventy-seven bundles was prepared under the supervision of Officer Eichmann. In the experience of the Customs agents assigned to the investigation, the amount, denominations, condition and means of packaging of the currency were consistent with currency typically used in connection with narcotics trafficking.

Customs Special Agents Velez and Stingle subsequently questioned Mr. Camacho about the currency. Before beginning the interview, Mr. Camacho was advised of his *Miranda* rights in both English and Spanish, and he signed a waiver form. Mr. Camacho first claimed that the currency came from the proceeds of the sale of an

apartment building which he believed was owned by a person in Bogota, Colombia. He stated that he did not know the identity of the buyer or the seller of the building. He stated that his brother-in-law, Andres Echavarria, had called him several days earlier and had asked him to pick up some money. Mr. Camacho stated that he agreed to pick up the currency in New York from a person identified only as "Gordo" in exchange for a $3,000 commission. He also stated that the currency did not belong to him or his brother-in-law.

Mr. Camacho later recanted his statements regarding the sale of the apartment building and conceded that he had assumed that the currency represented the proceeds from illegal narcotics trafficking. Mr. Camacho stated that he had been in Colombia for three days during the week immediately prior to the stop by Trooper Tomasello.

Special Agent Velez called Mr. Echavarria in Bogota, Colombia at a telephone number which Mr. Camacho had provided. Agent Velez initially talked to the female who answered the phone, and then he talked to Mr. Echavarria. Mr. Echavarria stated that he had no knowledge of the currency or of Mr. Camacho's trip to New York. Mr. Echavarria stated that he had talked to Mr. Camacho two days earlier and had asked Mr. Camacho to purchase a laser disc from a Florida store and to mail it to him in Bogota.

Based on the foregoing facts, the Customs agents concluded that the defendant property had been furnished in exchange for, or probably were proceeds traceable to the exchange of, controlled substances. Thereafter, the currency was seized by the Customs Service under 21 U.S.C. § 881. Following these actions, Trooper Tomasello issued Summons No. 746115 for speeding to Mr. Camacho. Mr. Camacho was released from custody on the morning of February 13, 1987.

After Mr. Camacho's release, the Customs Service conducted an investigation into the currency in question and its origins. The Customs Service was advised by sources in Colombia that the telephone number at which Agent Velez had reached Mr. Echavarria was subscribed to in Mr. Echavarria's name. After an analysis of Customs Service records, it was determined that the claimant, Maria Clara de Echavarria, had reported her importation in the United States of approximately $400,000 in cash and negotiable instruments between 1982 and 1988. Ms. Echavarria is Mr. Camacho's sister. Based on certain of Ms. Echavarria's banking records, the Customs Service determined that Ms. Echavarria had drawn approximately $400,000 from her checking account at the Bank of Miami between May 1985 and May 1987.

The Customs Service's investigation into Ms. Echavarria's purported purchase of clothing in the United States for resale in her Colombia boutique did not reveal expenditures by her of sums approaching $400,000. The Customs Service interviewed two persons identified by Ms. Echavarria as her major suppliers of clothing in the United States. The interviews disclosed that Ms. Echavarria spent $3,300 on such clothing between 1986 and 1988. Neither person interviewed recognized Ms. Echavarria's name when first asked by the Customs Agent.

At the bench trial, Mr. Camacho testified that he had received a telephone call from Ms. Echavarria in Colombia at approximately 11:00 p.m., on February 11, 1987, and that Ms. Echavarria asked him to pick up the defendant currency in New York the following day. Mr. Camacho stated that he thought that Ms. Echavarria had purchased the defendant currency with Colombian pesos in Colombia, and that this was the first time she had asked him to pick up currency in the United States. He stated that Ms. Echavarria had intended to use the currency to buy clothes in New York. He stated that she had not had the money sent to the United States in checks because Colombian checks may unexpectedly bounce in the United States, and very few people in the United States accept checks from foreigners.

Ms. Echavarria testified that she had accumulated approximately $100,000 in Colombian pesos from her various business enterprises, which include the aforemen-

tioned boutique as well as a duty free liquor store in an airport and a frozen food manufacturing and distribution business. Ms. Echavarria testified that she operated her boutique in a twenty foot by twenty foot room on the third floor of her house in Colombia. She stated that she started the business of buying clothing in the United States and selling it in Colombia in 1977 with $600 or $800 of her savings. She stated that she did not keep books or records, a ledger or profit or sales records, and that she had no documents of any kind on her various businesses.

Ms. Echavarria stated that she had decided to change the $100,000 in pesos into United States currency so that she could come to the United States or go to Europe in order to purchase clothing for her boutique. She stated that any money which was not used to purchase clothing would have been deposited in a bank in Miami. Ms. Echavarria stated that she contacted the office of Mr. Jorge Polmbo, who had a currency exchange house in Bogota, Colombia. She stated that Mr. Polmbo advised that she could receive a better rate of exchange if she was willing to receive the money in the United States.

Ms. Echavarria testified that she agreed that the money could be delivered in New York on the morning of February 12, 1987. She then called Mr. Camacho and asked him to fly to New York on February 12, 1987, in order to meet the representative of Mr. Polmbo who would deliver the money in United States currency. Ms. Echavarria stated that she had purchased the United States currency in Colombia from Mr. Polmbo, paying him half in cash and half in checks prior to receiving any confirmation that the currency had been delivered to Mr. Camacho in New York. Ms. Echavarria stated that she did not request a receipt for the currency exchange because of her long standing business relationship with Mr. Polmbo and the fact that the purchase of United States currency in excess of $5,000 violated Colombian law. She also stated that Mr. Polmbo had left Bogota "a year ago" with money he had robbed from different people.

Mr. Camacho testified that Ms. Echavarria had directed him to pick up the currency at LaGuardia Airport in New York City from a man identified only as "Gordo." Mr. Camacho stated that he did not know or inquire about Gordo's real name. Mr. Camacho stated that on February 12, 1987, he met Gordo at the airport after he spotted Gordo holding a sign with Mr. Camacho's name on it. According to Mr. Camacho, he and Gordo walked to the airport parking lot and to Gordo's car. Mr. Camacho stated that the currency was inside of a suitcase in the car. Mr. Camacho stated that he randomly counted the money to satisfy himself that it was all there. He understood that the amount was to be approximately $100,000. He also stated that some of the bundles of currency had bank slips around them indicating the bundle's amount. Mr. Camacho recalled his deposition testimony that one-hundred dollar bills accounted for over half of the total currency. He testified that he placed the currency inside a suitcase of his own and then checked into the airport hotel. Mr. Camacho stated that he subsequently decided to leave the hotel and to begin driving to Washington, D.C., where he was to meet one of his cousins. It was on this southward journey from New York that Mr. Camacho was stopped in Salem County, New Jersey by Trooper Tomasello.

Mr. Camacho admitted that he had lied to Trooper Tomasello and the Customs Service agents about the currency being the proceeds of the sale of an apartment building and stated that he had thought it would have been difficult for them to understand the purchase of U.S. dollars with Colombian pesos. He conceded that he had told the Customs Service agents a number of different stories about the origin of the defendant currency. Mr. Camacho recalled his deposition testimony that he had never "really got into details" with Ms. Echavarria about the substance of Special Agent Velez's telephone call to the Echavarrias while Mr. Camacho was in custody at the Woodstown State Police barracks. With regard to Special Agent Velez's call, Ms. Echavarria stated that she recalled only that the agent had advised that something

**160**

was wrong with Mr. Camacho, and that the agent had not explained why Mr. Camacho had been detained.

Mr. Camacho acknowledged that, while he had testified in his deposition that he had never used his mother's name (i.e. Tellez) in the United States, his name appeared as "Juan R.C. Tellez" on three U.S. Customs Service currency transaction reports introduced into evidence. He further acknowledged that, while he had earlier denied that he had ever performed a currency transaction for any other party and while he had expressly denied performing such transactions for Lillana Pombo, Keops Organization or Jaime Montana, he had in fact performed currency transactions for all three of these parties, as reflected in the aforementioned currency transaction reports in evidence.

Ms. Echavarria acknowledged that, while she had denied at her deposition that she had ever imported currency into the United States on behalf of anyone else and while she had expressly denied such importation on behalf of Helga Maass or Mr. Camacho, she had in fact imported $58,000 for Helga Maass in May 1985 and $83,000 for Mr. Camacho in April 1986, as reflected in U.S. Customs Service records introduced into evidence.

At the bench trial, Jay Marshall Poupko, Ph.D., testified regarding the general contamination of United States currency with cocaine as an expert toxicologist on behalf of the claimants. Dr. Poupko stated that he used a chemical analysis to study the presence of cocaine residue on currency in several regions of the United States. After analyzing random samples of currency in varying denominations from banks throughout the Northeast, including New Jersey and New York, Dr. Poupko concluded that all the bills contained cocaine residue. All of the currency analyzed by Dr. Poupko was used currency. Dr. Poupko did not analyze the defendant currency. Dr. Poupko's analysis did not deal with odors or scents associated with cocaine or other drugs, and it in no way related to the detection of such odors by canines. Dr. Poupko testified that cocaine can easily be transferred from one object to another due to its physical properties.

Officer Eichmann testified that a narcotics detector dog alerts to the presence or odor of a narcotic and that no chemical analysis is involved in the detection of narcotics by canines. He stated that Coco had been exposed to currency without alerting on a number of occasions and recounted instances in which Coco had alerted to some currency associated with narcotics and not to other currency at the same location.

## II. CONCLUSIONS OF LAW

This court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1345 and 1355, and over the defendant property under 19 U.S.C. §§ 1603–1605.

21 U.S.C. § 881(a)(6) provides that property exchanged for or intended to be exchanged for illegal controlled substances is subject to forfeiture to the United States. Section 881(d) directs that the burden of proof in a forfeiture action is controlled by 19 U.S.C. § 1615. Under 19 U.S.C. § 1615, the government must initially show probable cause to believe that the defendant property was connected with illegal drug transactions. Once probable cause is shown, the private claimant bears the burden of proving by a preponderance of the evidence that the defendant property was not involved in illegal drug transactions. *United States v. $250,000*, 808 F.2d 895, 897 (1st Cir.1987). To show probable cause, the Government need only show a "reasonable ground for belief of guilt, supported by less than *prima facie* proof but more than mere suspicion." *Id. citing United States v. $364,960*, 661 F.2d 319, 323 (5th Cir.1981).

The Government's probable cause burden is met by a showing that the Government's agents had a reasonable ground for belief that a substantial connection existed between the defendant property and illegal drug transactions. *United States v. $364,960*, 661 F.2d at 323. The Government need not show the relationship of the defendant property to a particular

drug transaction. Rather, the Government must only show that the defendant property was probably derived from illegal drug trafficking activities. *United States v. $250,000*, 808 F.2d at 899–900.

■ The connection of the defendant property to drug trafficking may be shown by circumstantial evidence and inferences derived from circumstantial evidence and need not be shown by direct proof. *United States v. $4,255,000*, 762 F.2d 895, 903–04 (11th Cir.1985); *United States v. Brock*, 747 F.2d 761, 763 (D.C.Cir.1984). The Government's showing of probable cause may be made wholly with otherwise inadmissible evidence, such as hearsay, and it may include facts learned after the seizure of the defendant property. *United States v. $250,000*, 808 F.2d at 899; *United States v. $41,305 in Currency and Traveler's Checks*, 802 F.2d 1339, 1343 (11th Cir.1986). In evaluating the issue of probable cause, the court may consider common experience and the realities of normal life and must base its conclusions on all attendant circumstances. *United States v. $250,000*, 808 F.2d at 899; *United States v. $4,255,-000*, 762 F.2d at 904.

■ We conclude that the Government has made the required showing of probable cause. We note the large amount of money found in Mr. Camacho's car. The fact of an extremely large amount of money by itself constitutes strong evidence that the money was furnished in exchange for illegal drugs. *United States v. $2,500*, 689 F.2d 10, 16 (2d Cir.1982); *United States v. $364,960*, 661 F.2d at 324. The packaging, denominations and condition of the large amount of money that Mr. Camacho was carrying further support a reasonable belief that the money was connected with drug trafficking. The money found in the car consisted of bills in denominations of $20 and smaller. The bills were of varying ages and conditions, and they were bundled together with rubber bands. Currency of such denominations and wrapped in such a way may reasonably be inferred to have come from drug dealing activities. *United States v. One 1982 Chevrolet Camaro and $32,980*, Civil Action No. 85-1045(JFG),

1987 WL 61304 (D.N.J. Apr. 22, 1987); *United States v. $319,820*, 620 F.Supp. 1474, 1476 (N.D.Ga.1985).

The fact that a large amount of money was being transported southward from New York through a well known drug corridor by a Colombian national who resides in Miami further supports the Government's showing of probable cause. The reputation of an area for criminal activity may be relied on to support an inference of criminal conduct. *See United States v. Rickus*, 737 F.2d 360, 365 (3d Cir.1984). The area where Mr. Camacho was stopped by Trooper Tomasello, along Route 40 in Salem County, New Jersey, carries such a volume of drug traffic that it is commonly known as "Cocaine Alley." *See United States v. $33,500*, Civil Action No. 86-3348(MHC), 1988 WL 169272 (D.N.J. Aug. 17, 1988); *United States v. $32,310*, Civil Action No. 85-4004(MHC), 1988 WL 169271 (D.N.J. June 23, 1988). Colombia is a known major source of drugs which eventually get trafficked throughout the United States, and Miami is a known center for drug trafficking and money laundering. *United States v. $5,644,540*, 799 F.2d 1357, 1363 (9th Cir.1986); *United States v. $364,960*, 661 F.2d at 323–24. We are entitled to take such common experience considerations into account. *United States v. $319,820*, 620 F.Supp. at 1477.

Other facts support our conclusion that the Government has met its probable cause burden. Mr. Camacho was observed to be nervous by Trooper Tomasello, and he gave varying and conflicting accounts of the origin of the defendant currency to the New Jersey State Police and the Customs Service. Mr. Camacho eventually told the troopers and/or the Customs agents that the defendant currency was the proceeds of drug trafficking, and that his earlier statements about the currency not being related to drugs were untruthful. Coco, the Customs Service narcotics detector dog, alerted quickly to the defendant currency and identified it under controlled conditions to be tainted by narcotics. Alerts and identifications by trained narcotics detector dogs may support a showing of probable

cause. *United States v. $319,820*, 620 F.Supp. at 1476; *see United States v. Massac*, 867 F.2d 174, 176 (3d Cir.1989). As Dr. Poupko's study did not deal with a scent or odor analysis of currency and could not address directly the validity of narcotics detection by dogs, it was considered but we do not give it much weight under the circumstances of this case.

In light of these factors, we find that the Government has shown probable cause to believe that the defendant currency had been furnished in exchange for illegal drugs or that it constitutes the proceeds of such an exchange. We now turn to the issue whether the claimants have shown, by a preponderance of credible evidence, that the defendant currency was not furnished or intended to be furnished in exchange for illegal drugs. *See United States v. $250,000*, 808 F.2d at 897. We find that they have not.

■ In order to meet their burden of proof, the claimants must show that they lacked knowledge of the fact that the defendant currency was related to drug trafficking. *United States v. $10,694*, 828 F.2d 233, 234–35 (4th Cir.1987); *United States v. $4,255,000*, 762 F.2d at 907. We find that the claimants have failed to show that they had no knowledge of the relationship between the defendant currency and drugs. We find their claim that the defendant currency was actually part of a scheme to smuggle money into the United States in order to receive a preferable exchange rate to be incredible under the circumstances.

No document or other evidence, other than the testimony of the claimants themselves, supports the contention that the defendant currency was to be used to buy clothing in New York or Europe for resale in Bogota. Mr. Camacho himself admitted to law enforcement officers in February of 1987 that the defendant currency was the proceeds of drug trafficking. At that time, he also stated that his earlier versions concerning the money and its origins were untruthful. There was no evidence, other than the statements of Ms. Echavarria, explaining how the operator of a twenty foot by twenty foot clothing boutique which was started with an initial investment of $600 or $800 and which was located on the third floor of a house in Bogota, Colombia, could generate approximately $100,000 in cash in order to purchase American and European fashions.

The evidence at trial showed that both of the claimants previously had participated in other large cash transactions which the Customs Service had found suspicious and had monitored. The evidence showed that Mr. Camacho used his mother's maiden name in three such transactions. Both of the claimants denied any connection with such prior transactions at their depositions, and they admitted at trial that their deposition testimony in this regard had been untruthful.

The claimants offered no explanation for the condition and packaging of the defendant currency. Other than the testimony that Gordo was Mr. Polmbo's representative, there was no explanation of how or why the delivery of money at the airport had been done by an unknown and suspicious Colombian without any documentation. We note that the lack of a receipt for such a large transaction as the one alleged by the claimants is unusual under normal circumstances. We also note that Mr. Polmbo, Ms. Echavarria's alleged source of the defendant currency, apparently has fled from the law in Colombia according to the claimants' own testimony.

We simply find it incredible to accept the claimants' explanation of the source of the defendant currency. Therefore, we find that the claimants have failed to meet their burden of proving, by a preponderance of the credible evidence, that the defendant currency was not furnished or intended to be furnished in exchange for illegal drugs.

The claimants have proposed a conclusion of law to the effect that Mr. Camacho's consent to Trooper Tomasello's search of the car was not voluntary, and that, therefore, the fruits of the allegedly illegal search, including Mr. Camacho's statements while in custody and the defendant currency itself, must be suppressed and not considered by this court. We will not make such a conclusion of law.

Probable cause for forfeiture cannot rest upon tainted evidence because the exclusionary rule applies in civil forfeiture proceedings. *Vance v. United States,* 676 F.2d 183, 188 (5th Cir.1982). The Fourth and Fourteenth Amendments are not violated by a warrantless search if the search was conducted pursuant to consent. The standard for the validity of a consent search is whether the consent was voluntary or coerced as analyzed under all of the circumstances of the individual search. *Schneckloth v. Bustamonte,* 412 U.S. 218, 233, 93 S.Ct. 2041, 2050, 36 L.Ed.2d 854 (1973).

After stopping Mr. Camacho's car, Trooper Tomasello asked Mr. Camacho if he could search the car. The only evidence indicates that Mr. Camacho consented to the search without comment. Prior to conducting the search, Trooper Tomasello advised Mr. Camacho of his right to refuse to consent to the search, and he provided Mr. Camacho with a standardized consent form to fill out. While sitting in the back seat of the trooper's patrol car, Mr. Camacho signed the consent form. No other evidence has been offered regarding the circumstances surrounding Mr. Camacho's consent to the search. We find that Mr. Camacho consented to the search voluntarily, and that he was not coerced into consenting. Accordingly, we may properly consider the statements made by Mr. Camacho while in custody and the defendant currency itself in our evaluation of this case.

In summary, we find that the Government has met its burden of proving probable cause to believe that the defendant currency had been furnished in exchange for illegal drugs or that it constitutes the proceeds of such an exchange. We further find that the claimants have failed to introduce sufficient credible evidence to show, by a preponderance of the evidence, that the defendant currency was not involved in illegal drug activity. Therefore, we will grant judgment for the plaintiff and order the defendant currency forfeit to the United States pursuant to 21 U.S.C. § 881(a)(6).