*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* M FLOYD, Minor.

UNPUBLISHED
November 21, 2023

No. 362706
Macomb Circuit Court
Family Division
LC No. 2019-000015-NA

Before: BOONSTRA, P.J., and GADOLA and MALDONADO, JJ.

PER CURIAM.

Respondent-father, A. Floyd, appeals as of right the trial court's order terminating his parental rights to the minor child, MF, pursuant to MCL 712A.19b(3)(b)(*i*) (parent's act caused physical injury to sibling), (b)(*ii*) (failure to prevent physical injury to sibling), (j) (reasonable likelihood of harm if returned to the parent), and (k)(*vi*)(parent abused sibling and the abuse included murder). We affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In late 2018, respondent lived with his romantic partner, S. Barksdale, and their two children, MF and AF. Also living in their apartment was ND, Barksdale's then six-year-old daughter from a prior relationship. On the morning of December 25, 2018, the family began celebrating Christmas by opening gifts. A video recording showed AF, then 18 months old, opening Christmas presents. Later that afternoon, between 2:00 p.m. and 2:30 p.m., the family drove to the maternal grandmother's home to celebrate the holiday. According to respondent, AF appeared to have fallen "asleep" in her car seat and she remained asleep as the family made the approximate 25-minute trip to the grandparent's home. After arriving at the home, a relative noted that something appeared to be wrong with AF, who had been "sleeping" in a relative's arms. At that point, respondent, Barksdale, and another family member drove AF to the hospital, which was across the street from the grandmother's home. Resuscitation efforts were unsuccessful and the child was pronounced deceased. An autopsy did not initially reveal the cause of AF's death, but toxicology tests, received in January 2019, indicated that AF died from an overdose of fentanyl. Respondent and Barksdale were arrested that day. On January 10, 2019, the Department of Health and Human Services ("DHHS") petitioned the court to formally remove ND and MF from the care of respondent, Barksdale, and ND's legal father. DHHS later amended the petition to seek

termination of respondent's and Barksdale's parental rights at the initial disposition. Pursuant to a safety plan, MF and ND were first placed together in a licensed foster home and then, eventually, with relatives.

Respondent's and Barksdale's adjudication trial was adjourned multiple times. Initially the delays were related to criminal matters arising from AF's death. In late 2019, respondent pleaded no contest to second-degree murder, second-degree child abuse, and delivery or manufacture of a controlled substance. In January 2020, the court sentenced respondent to serve 5 to 20 years' imprisonment. After the criminal matters concluded, restrictions related to the COVID-19 pandemic further delayed the adjudication trial. Ultimately, a combined adjudication trial and statutory-grounds hearing was held in May 2022. At the conclusion of this trial, the trial court first held that a preponderance of the evidence supported the court's assumption of jurisdiction over MF pursuant to MCL 712A.2(b)(1) and (2). Thereafter, the court found that clear and convincing evidence also supported termination of respondent's parental rights to MF pursuant to MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (j), and (k)(*vi*). Following a two-day best-interest hearing in June 2022, the court terminated respondent's parental rights, finding that termination was in MF's best interests. This appeal followed.

## II. ADMISSIBILITY OF EVIDENCE AT THE ADJUDICATION

Respondent argues that the trial court relied on inadmissible evidence to find statutory grounds for jurisdiction. We agree that the trial court improperly admitted irrelevant videos, but this error does not warrant reversal.

This Court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion. *In re Utrera,* 281 Mich App 1, 15; 761 NW2d 253 (2008). The trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id.*

Child protective proceedings are generally divided into an adjudicative phase and a dispositional phase. *In re Brock*, 442 Mich 101, 108; 499 NW2d 752 (1993). "The adjudicative phase determines whether the . . . court may exercise jurisdiction over the child. If the court acquires jurisdiction, the dispositional phase determines what action, if any, will be taken on behalf of the child." During the adjudicative phase, when jurisdiction is determined, the rules of evidence apply and legally admissible evidence is required. *In re AMAC,* 269 Mich App 533, 536-537; 711 NW2d 426 (2006).

Respondent takes specific issue with the trial court's admission of several videos that were recovered from his social media and Apple iCloud accounts.[1] The challenged videos depicted,

---

[1] In his brief, respondent suggests that numerous other photographic exhibits should have been excluded. However, respondent does not expand upon why any of these particular exhibits were not admissible, no objection was raised to these exhibits in the trial court, and respondent's statement of the questions presented raises only videos as being objectionable. Therefore, we limit our review accordingly.

among other things, hands fanning out large sums of cash in $20, $50, and $100 dollar denominations. One of the videos depicts three individuals in a car, but only the face of one individual, not respondent, is revealed. An individual in the passenger seat has a handgun on his lap and two brown bottles that typically hold prescription liquid medications. Of particular note, two of the videos do capture respondent's face. In one of these videos, respondent is seen climbing onto a countertop, retrieving a large stack of cash from the top of an upper kitchen cabinet, and then fanning out the stack of money before letting the bills fall onto the counter. In another video, respondent and Barksdale are seated in what appears to be a restaurant booth. Respondent, at one point, fans out a large sum of cash. Detective Twardesky, the lead investigator, identified respondent as the person climbing onto the counter and respondent and Barksdale as the individuals seen in the restaurant video. Finally, one video that was admitted at the trial was simply a music video.

## A. RELEVANCE

Respondent argues that the court erred by admitting these videos because they were irrelevant and unfairly prejudicial. With respect to the two videos in which respondent can be seen fanning cash, we disagree. With respect to the other videos, we agree; however, the erroneous admission of these videos does not warrant reversal.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Generally speaking, relevant evidence is admissible and irrelevant evidence is not admissible. MRE 402. However, MRE 403 provides that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In this case, during the adjudicative phase, DHHS was required to establish that MF came within the court's jurisdiction. "To acquire jurisdiction, the factfinder must determine by a preponderance of the evidence that the child comes within the statutory requirements of MCL 712A.2." *Brock*, 442 Mich at 108-109. MCL 712A.2(b) provides for jurisdiction over a child under the following circumstances, among others:

> (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. . . .

> (2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in. . . .

Thus, jurisdiction is proper when, among other things, a child's home or environment is unfit based on a parent's criminality. DHHS sought admission of the video recordings to support its theory

that respondent was engaged in drug-trafficking activities. Evidence that respondent was involved with drug trafficking was relevant because it suggested that his criminality led to AF's fentanyl overdose. Thus, evidence having any tendency to make it more probable that respondent was engaged in drug trafficking was relevant.

## 1. MUSIC VIDEO

One of the videos that was admitted into evidence was a music video. This video was artwork, and nothing about it suggested in any way that respondent was a drug dealer. Therefore, it was not relevant; however, the error was harmless.

MCR 3.902 provides that "[l]imitations on corrections of error are governed by MCR 2.613." MCR 2.613(A) provides:

> An error in the admission or the exclusion of evidence, an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice.

See also *Utrera*, 281 Mich App at 14 (applying civil harmless error standard in context of termination of parental rights).

Notably, nothing in the court's opinion and order suggested that it considered the music video when making its decision. Moreover, this video was so thoroughly and clearly irrelevant that it is not clear how its admission could have been harmful to respondent. Indeed, this video was not even tangentially related to these proceedings and therefore could not have caused unfair prejudice to respondent. Therefore, there is no basis upon which to conclude that refusal to reverse because of this error would be "inconsistent with substantial justice." MCR 2.613(A).

## 2. VIDEOS IN WHICH RESPONDENT CAN BE SEEN

The videos in which respondent can be seen fanning large quantities of cash are relevant because they, in tandem with the other evidence, tend to suggest that respondent was selling drugs.

The court admitted two videos that, contrary to respondent's arguments, were relevant. In one video, respondent climbs on top of the kitchen counter and grabs several large stacks of cash that are numerous denominations. Respondent fans out the money as he drops it down onto the counter. He then grabs several stacks of money that are bound together and tosses them. While it is impossible to count how much money respondent pulls out and drops, it is clearly several thousand dollars. In a different video, respondent is at a restaurant with several people, including Barksdale. Respondent takes a large stack of cash, at least some of which is in $100 denominations, and fans it out in front of the camera.

"The fact of an extremely large amount of money by itself constitutes strong evidence that the money was furnished in exchange for illegal drugs." *In re Forfeiture of $180,975*, 478 Mich 444, 464 n 30; 734 NW2d 489 (2007), quoting *United States v $87,375 in US Currency*, 727 F Supp 155 (1989). That is because it is common knowledge that drug transactions are performed

using cash to make them more difficult to trace and to avoid suspicious banking activity. In this case, the probative value of the videos is boosted when viewed in conjunction with the other evidence that respondent was selling drugs. For example, when the police searched respondent's apartment they seized scales, pill presses, unregistered firearms, razor blades, and blank lotto betting slips. Moreover, the large quantities of cash were not consistent with respondent's reported income nor his bank account balances. Therefore, these videos were relevant and had significant probative value.

### 3. VIDEOS IN WHICH RESPONDENT CANNOT BE SEEN

The videos in which an unidentifiable person is seen fanning cash, handling a gun, or handling apparent prescription drugs were not relevant because it was impossible to ascertain whether respondent was in them. However, this error was harmless.

The court also admitted six videos in which an unidentifiable person is seen fanning out large sums of money. In one video, the person also has a gun and some sort of prescription medication on his lap. Because there is no way of knowing who is seen with the money in these videos, they are not relevant. However, "[i]mproper admission of evidence is harmless if it is merely cumulative to other properly admitted evidence." *Detroit/Wayne Co Stadium Auth v Drinkwater, Taylor & Merrill, Inc*, 267 Mich App 625, 652; 705 NW2d 549 (2005). As discussed, two videos in which defendant is seen fanning large sums of cash were properly admitted. Therefore, these videos were cumulative of other videos legitimately establishing that defendant was in possession of large quantities of cash. Accordingly, we conclude that the error was harmless.

### B. AUTHENTICATION

Respondent argues that the proper foundation was not established for the admission of the above-described videos. We disagree.

MRE 901(a) provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The testimony of a "witness with knowledge" asserting "that a matter is what it is claimed to be" is an example of proper authentication or identification. MRE 901(b)(1) (emphasis omitted). Because most of the videos were inadmissible based on relevance grounds, we will only analyze this issue with respect to the two that depicted respondent fanning and tossing large quantities of cash. These exhibits were purportedly videos of respondent that were found on respondent's social media and his iCloud account. Detective Twardesky testified that he recovered the videos during his investigation into AF's death and that the videos presented at trial were the ones he had recovered. Moreover, Detective Twardesky was familiar with respondent's appearance and testified that it was respondent who was depicted in those two videos. This testimony was sufficient to authenticate the exhibits. Respondent is correct that it is unknown when the recordings were made, who posted them, or who could access them. However, these are issues of weight rather than admissibility. If there is no abuse of discretion by the trial court when authenticating the evidence pursuant to MRE 901(a), then it is left to the fact-finder to

determine the reliability and weight of the evidence. *People v Smith,* 336 Mich App 79, 107; 969 NW2d 548 (2021).[2]

## C. OPINION EVIDENCE

Respondent argues that the court erred by allowing Detective Twardesky, who was not recognized as an expert witness, to offer opinion testimony suggesting that the videos were consistent with selling drugs. We disagree.

Respondent takes issue with the court allowing Detective Twardesky to testify that the videos and items seized from respondent's apartment during the execution of a properly issued search warrant were consistent with those used by individuals engaged in drug-trafficking activities. Respondent asserts that Detective Twardesky's testimony was inadmissible because he was never qualified as an expert. However, it was not necessary for the detective to be qualified as an expert because his testimony was admissible under MRE 701.

Lay opinion testimony is admissible pursuant to MRE 701 if it is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." It is permissible for a police officer to offer a lay opinion that a defendant's behavior is consistent with criminal activity if the police officer has experience involving that particular sort of criminal activity. For example, in *People v Daniel*, 207 Mich App 47, 57; 523 NW2d 830 (1994), a police officer was allowed to offer his opinion that the defendant "was selling crack cocaine" based on his observations of the defendant repeatedly running out of his apartment to engage in 10 to 15 second interactions with people who had pulled up to the building while leaning into the windows.

In the present case, Detective Twardesky testified that the unexplained possession of large sums of cash was consistent with drug-trafficking activities. He similarly explained that several of the items seized during the search of respondent's apartment, including scales, pill presses, unregistered firearms, razor blades, and blank lotto betting slips, were typically used when packaging and distributing drugs. The witness did not simply opine that the items were consistent with drug trafficking, he explained how the items would be used in an effort to support his opinions. The challenged testimony was based on Detective Twardesky's personal observations and experiences, and the testimony served to explain why respondent's possession of certain items was relevant to the investigation into AF's ingestion of a lethal amount of fentanyl. Therefore, the testimony was admissible pursuant to MRE 701.

---

[2] Respondent makes a cursory reference to MRE 903, stating that the videos were "misleading and prejudicial" pursuant to that rule. We are unable to untangle this argument. MRE 903 provides that the court generally does not need testimony from "a subscribing witness" in order to authenticate a written document; it has no bearing on this case. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give issues cursory treatment with little or no citation of supporting authority." *In re Warshefski*, 331 Mich App 83, 87; 951 NW2d 90 (2020) (quotation marks and citation omitted).

## III. STATUTORY GROUNDS FOR TERMINATION

Next, respondent argues that the trial court erred by finding that statutory grounds for termination of his parental rights were established by clear and convincing evidence. We disagree.

In order to terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re Trejo,* 462 Mich 341, 355; 612 NW2d 407 (2000). This Court reviews the trial court's findings under the clearly erroneous standard. MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Miller,* 433 Mich 331, 337; 445 NW2d 161 (1989).

The trial court terminated respondent's parental rights to MF pursuant to MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (j), and (k)(*vi*). We conclude that there was sufficient evidence to support termination pursuant to MCL 712A.19b(3)(j), and because only one ground needs to be proved by clear and convincing evidence, see *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011), we decline to review the remaining grounds. Pursuant to MCL 712A.19b(j), termination is warranted if "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." What happened to AF supports an inference that MF would be harmed if returned to respondent's care because "the doctrine of anticipatory neglect allows an inference that a parent's treatment of one child is probative of how that parent may treat other children." *In re Kellogg*, 331 Mich App 249, 259; 952 NW2d 544 (2020).

The testimony presented during the combined adjudication trial and statutory-grounds hearing established that MF's sibling, AF, died from ingesting a lethal quantity of fentanyl. Further, there was clear and convincing evidence that AF had access to the fentanyl because respondent brought the drug into the home as part of his participation in drug-trafficking activities. During a search of the apartment, the police found items consistent with drug-trafficking activities, including two unregistered firearms, scales, pill grinders or pressers, and unused lotto betting slips. Many of these items were concealed in a locked safe found in a closet, which also contained documents related to respondent's earlier conviction for a drug-related crime. Trace amounts of fentanyl were found on one of the recovered grinders. After his arrest, respondent pleaded no contest to second-degree murder, second-degree child abuse, and delivery or manufacture of a controlled substance. There was also testimony from an older sibling that she observed AF drink from a cup in the family home and then, shortly thereafter, AF began falling down. A police officer testified that both respondent and Barksdale reported that AF fell asleep shortly before being put in a car seat at their home, that she remained "asleep" during the 20 to 25-minute drive to the maternal grandmother's house, and she continued to appear to be "asleep" after their arrival. From this evidence, the trial court could reasonably conclude that respondent's actions caused AF's death.

There was also evidence from which the court could and did conclude that respondent, when released from prison, would have a difficult time abandoning a lifestyle that included criminal activity. Respondent did not cease his criminal activity after his prior convictions. The investigating officer testified that, before respondent's most recent incarceration, he had no obvious source of a legitimate income. Further, the videos depicting respondent showing off large

sums of cash and bragging about owning expensive eyewear suggest that he had become accustomed to and enamored with the income generated by his illegal activity. From this evidence, the trial court could reasonably find that once respondent was released from prison, he would have a difficult time abandoning his criminal lifestyle and, as a result, MF would be at risk of harm if ever returned to respondent's home. Accordingly, the trial court did not clearly err by finding that clear and convincing evidence supported termination of respondent's parental rights pursuant to MCL 712A.19b(3)(j).

## IV. BEST INTERESTS

Respondent also argues that the trial court erred by finding that termination of his parental rights was in MF's best interests. We disagree.

Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *In re Moss,* 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones,* 286 Mich App 126, 129; 777 NW2d 728 (2009).

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of the parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). When considering whether termination of parental rights is in a child's best interests, a court may consider a variety of factors. *In re White,* 303 Mich App 701, 713; 846 NW2d 61 (2001). These factors include the bond between the child and the parent, the parent's ability to parent the child, the child's need for permanency and stability, the advantages of a foster home over the parent's home, the parent's compliance with the case service plan, the parent's visitation history with the child, the child's well-being, and the possibility of adoption. *Id.* at 713-714. In addition, the trial court should consider the child's safety and well-being, including the risk of harm a child might face if returned to the parent's care. See *In re Van Dalen*, 293 Mich App 120, 142; 809 NW2d 412 (2011). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *Jones,* 286 Mich App at 131. "The trial court should weigh all the evidence available to determine the child[]'s best interests." *White,* 303 Mich App at 713. The court's focus must be on the child and not the parent. *Moss,* 301 Mich App at 87; 836 NW2d 182 (2013).

A preponderance of the evidence supports the trial court's finding that termination of respondent's parental rights was in MF's best interests. The death of AF, MF's 18-month-old sister, is compelling evidence that respondent is unable to properly supervise a child or keep that child safe. AF's death was not simply the product of negligent supervision of a curious toddler; rather, the child died from fentanyl poisoning, a drug that should never have been in respondent's home. The medical examiner testified that there was no legitimate explanation, medical or legal, for fentanyl to be in the home. Moreover, respondent has a significant criminal history, which includes prior convictions for armed robbery in 2008, second-degree home invasion in 2018, a prior drug-related conviction in 2015, and after AF's death, respondent pleaded no contest to second-degree murder, second-degree child abuse, and delivery or manufacture of a controlled

substance, for which he was sentenced as a fourth-offense habitual offender to serve 5 to 20 years' imprisonment.[3]  This supports an inference that his criminality will continue after he is released.

By contrast, MF was placed with a paternal great aunt who is providing for his needs and, should the court terminate respondent's parental rights, is willing to adopt MF.  The evidence established that the paternal aunt is a teacher who had 30 years' experience teaching young children, including special-needs children.  This caregiver had seen to MF's medical, emotional, and educational needs, and she had offered him the opportunity to participate in a variety of sports and summer camp programs.  At the time of termination, MF had been in the paternal aunt's care for more than 3½ years, approximately half his life.  The caseworker testified that MF had adjusted well and was comfortable in this placement.  When considering a child's best interests, the court may consider the advantages of a foster home over the parent's home.  *In re Olive/Metts,* 297 Mich App 35, 42; 823 NW2d 144 (2012).  A court may also consider the possibility of adoption.  *White,* 303 Mich App at 713.  In this case, a preponderance of the evidence supports a finding that the paternal aunt's home was preferable to respondent's home because it would provide MF with the care and safety he required to facilitate his continued growth and development.

The trial court also recognized that during his incarceration, respondent participated in some services available in the correctional facility.  The evidence established that respondent also regularly wrote letters to MF, called him on the phone, attended virtual parenting time when offered, and participated by Zoom technology in MF's therapy through the Infant Mental Health program.  While respondent's efforts are commendable and he appeared to be compliant within the structure of the case service plan, a child died when respondent was unsupervised and left to his own devices.  Respondent asserts that termination of his parental rights was not appropriate because a strong parent-child bond exists.  The evidence clearly demonstrated that respondent and MF love each other.  However, while respondent and MF may have a bond, the trial court found that this factor did not outweigh MF's need for safety.  Further, the trial court acknowledged the testimony of MF's therapist that the child would be devastated if respondent's parental rights were terminated.  Indeed, this therapist opined that termination of respondent's parental rights would not be in MF's best interests.  The trial court, however, reasonably discounted the weight of the therapist's testimony in light of the fact that the therapist's opinion did not consider AF's death and the events that precipitated MF's removal from respondent's care.

Considering the foregoing, the trial court did not clearly err by finding that, on balance, the relevant factors weighed in favor of terminating respondent's parental rights.

Affirmed.

/s/ Mark T. Boonstra
/s/ Michael F. Gadola
/s/ Allie Greenleaf Maldonado

---

[3] At the time of the termination hearing, respondent's earliest release date was January 10, 2024.