**UNITED STATES of America, Plaintiff,**

**v.**

**$14,500.00 IN UNITED STATES CURRENCY and All Accrued Interest Thereon, Defendant.**

**No. 90–0545–CIV–ORL–18.**

United States District Court, M.D. Florida, Orlando Division.

April 1, 1991.

Gregory N. Miller, U.S. Attorney's Office, M.D.Fla., Orlando, Fla., for plaintiff.

Kenneth John Cotter, Cotter, Uhrig & Valerino, P.A., Winter Park, Fla., for claimant.

## ORDER

G. KENDALL SHARP, District Judge.

The government brought this civil forfeiture action in rem against defendant $14,-500.00 in United States currency under 21 U.S.C. § 881(a)(6) (1988). Jennifer Marie Mase claimed the currency. The court held a non-jury trial on March 12, 1991, and ruled from the bench that the money came from an illegal source and that it was used or was intended to be used for an unlawful purpose; therefore, the court ordered the forfeiture of the currency. In accordance with Federal Rule of Civil Procedure 52(a), the court enters this order.

### I. Findings of Fact

On January 26, 1990, Jennifer Marie Mase went to the Orlando International Airport to purchase a round-trip airline ticket from Orlando to Miami, Florida. She made the reservations earlier in the day and was scheduled to leave at 4:30 p.m. and return to Orlando at 7:55 p.m. that evening. The flight, however, was overbooked, and she had to buy a ticket on another flight scheduled to leave Orlando an hour after her original departure time. She purchased the ticket with cash and carried no luggage with her. She was still scheduled to return to Orlando at 7:55 p.m.

After paying for the ticket, Miss Mase asked the ticket agent for a bag. The

agent went into a room behind the counter and returned with a brown paper bag. Miss Mase took a large bundle of currency that was wrapped in a paper towel out of her purse. The money was in small bills, separated into individual piles, and secured by rubber bands. She placed the money into the paper bag, put the bag into her purse, and left the counter. The ticket agent saw the money and called airport security to report the matter. As Miss Mase walked to her departure gate, two agents of the Drug Enforcement Task Force followed her. Miss Mase stopped at a pay phone, dialed a telephone-pager number, and hung up the receiver. Shortly thereafter, she received a telephone call from Harlan Blackburn, a well-known Orlando criminal. According to Miss Mase, she called Mr. Blackburn because he was a friend and because she wanted to talk with someone while she waited for her flight to depart.

After Miss Mase finished her telephone conversation, the two Task Force agents approached her. One agent asked her whether she was carrying a large amount of cash. She admitted that she was, but refused to divulge the amount. The agent asked her where she was going with the money. Miss Mase told him she was traveling to Miami to visit her brother who was having financial troubles and needed cash quickly. She did not know how much money her brother needed, so she took a large sum to ensure having enough to pay his debts; the remaining money she would use to pay her expenses while she was in Miami. She carried cash, instead of a check, because she had planned the trip "on the spur of the moment." When asked where she had gotten the money, Miss Mase told the agents she had saved the money from her various jobs and had kept it under her mattress. She was unemployed at the time, and the jobs she had worked during the previous years were all low paying. Miss Mase was unable to give the agents her brother's telephone number for them to verify her story. She was nervous while she spoke with the agents.

Miss Mase agreed to accompany the agents to an office in the airport for questioning. In the office, she handed the brown paper bag to one of the agents. He placed the unopened bag on the floor next to several other paper items. A drug detection dog was brought into the room, and it alerted on the brown paper bag for the presence of a controlled substance. The agents seized the currency, counted it in Miss Mase's presence, and gave her a receipt for $14,500.00. The agents did not find any narcotics in the paper bag.

Miss Mase has changed her explanation regarding the source of the money on several occasions. Soon after she had spoken with the agents in the airport, a member of the Orlando Metropolitan Bureau of Investigation (OMBI) interviewed her in her home. She told him she had obtained the money from a friend who had received one-and-one-half million dollars in a lawsuit. At her deposition in September 1990, she stated she had received the money from various friends. The chief contributor was Eric "Tack" Hoffman, a millionaire and a good friend, who had given her $13,000.00. At trial, however, she said he had only given her $10,000.00. Mr. Hoffman did not testify on Miss Mase's behalf; he was allegedly traveling in Europe.

With respect to her trip to Miami, Miss Mase testified that she was visiting her brother not only to help him financially, but also to discuss the problems he was having with his girlfriend, the problems she was having with her boyfriend, and the possibility of her moving into his apartment and the two of them starting a photography business. Although she had a return flight the same day, she testified that she might not have taken it. Even though she did not have any luggage with her, she might have stayed in Miami had she and her brother agreed to live together and start a business.

About one month after the currency was seized at the airport, Miss Mase moved into the cottage behind Harlan Blackburn's residence. In July of the same year, she was arrested for constructive possession of cocaine. During their search of the cottage, the police found $919.00 in cash, a plastic bag with cocaine residue in it, a Pepsi–Cola

can converted into a smoking device, a propane torch, and a digital scale. Miss Mase testified that only the cash belonged to her. She claimed Mr. Blackburn owned the furniture in the cottage, and she never had reason to use it. As such, she did not know that the Pepsi can was in the dresser or that the plastic bag was underneath the pillow. She did know about the digital scale. Miss Mase claimed her boyfriend, a body builder, used it to weigh his food. Her boyfriend, however, testified that he was unaware of the digital scale.

## II. Conclusions of Law

### A. Government's Burden of Proof

 The government had the burden of proving it had probable cause to believe the currency it seized from Miss Mase at the airport was used or was intended to be used in an unlawful manner. *See* 21 U.S.C. § 881(a)(6) (1988). To establish probable cause, the government had to show that "a substantial connection exists between the property to be forfeited and an illegal exchange of a controlled substance." *United States v. A Single Family Residence*, 803 F.2d 625, 628 (11th Cir.1986). "Under Section 881(a)(6), the government is not required to show that the property is owned by a drug trafficker, but rather that it has a substantial connection to a drug transaction." *Id.* at 629. The probable cause needed is a " 'reasonable ground for belief of guilt, supported by less than prima facie proof, but more than mere suspicion.' " *Id.* at 628. "The existence of probable cause is judged 'not with clinical detachment, but with a common sense view to the realities of normal life.' " *Id.* The government is permitted to use "facts learned after the actual seizure of the money." *United States v. $41,305.00 in Currency & Traveler's Checks*, 802 F.2d 1339, 1343 (11th Cir. 1986). But, the government is not allowed to use facts learned after it files the forfeiture action. *United States v. $91,960.00*, 897 F.2d 1457, 1462 (8th Cir.1990).

The government showed that it had probable cause to seize the currency and institute this forfeiture action. Miss Mase bought an airline ticket to Miami, which is a source city for narcotics. She was sched-uled to stay in Miami for a short time and then return to Orlando. She paid for the ticket in cash. She made a telephone call to a pager number; pagers are commonly used in drug transactions. When the Task Force agents approached her, she admitted carrying a large amount of cash. Although she was unemployed at the time, she told the agents she had earned the money through her employment. She was unable to produce her brother's telephone number for the agents to verify the reason for her trip. Miss Mase was nervous while she spoke with the agents. Lastly, a drug detection dog alerted on the paper bag she was carrying. These facts established that the government had probable cause to believe the money was used or was intended to be used in an unlawful manner.

### B. Miss Mase's Burden of Proof

 After the government demonstrated the existence of probable cause, the burden of proof shifted to Miss Mase to establish by a preponderance of the evidence that the property was not subject to forfeiture. *A Single Family Residence*, 803 F.2d at 629. Miss Mase had the burden of showing that the currency had an independent, innocent source and that it was not used or intended to be used illegally. *$41,305.00 in Currency & Traveler's Checks*, 802 F.2d at 1343 n. 6; 21 U.S.C. § 881(a)(6). Miss Mase did not meet her burden of proof.

Miss Mase has offered contradictory accounts regarding the source of the money, which caused this court to disbelieve her testimony. In the airport she told the Task Force agents she had earned the money, even though she was unemployed at the time and has never held a high-paying job. When the OMBI agent interviewed her in her home, she said she had received the money from a friend who had won a large settlement in a lawsuit. At her deposition, she said she had received the money from a group of friends. The main contributor was Eric "Tack" Hoffman, but he did not appear in court to corroborate her story. The witnesses who testified on her behalf failed to convince this court that Miss Mase

had received the money from a legitimate source.

Even though no drugs or drug paraphernalia were found in Miss Mase's possession, the fact she was carrying a large amount of cash was strong evidence the money was used or was intended to be used for drugs. *United States v. $215,300.00 in United States Currency*, 882 F.2d 417, 419 (9th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 3242, 111 L.Ed.2d 752 (1990). The testimony of Miss Mase and of her witnesses did not give this court reason to believe that the money was intended for any other use. In addition, the fact the drug detection dog alerted on the paper bag suggested that the money inside the bag was exchanged or was intended to be exchanged for drugs. At trial, Miss Mase argued that in today's society an innocent person may receive money tainted with narcotics and that the bag, which she received from the ticket agent, may have been tainted; moreover, because the dog sniffed the unopened bag, she argued that the government could not establish whether the dog alerted on the bag or on the currency. Although the court agrees that money can become tainted from various sources and that the bag itself may have been tainted, when considered with the other evidence in this case, Miss Mase's defenses were ineffectual in convincing this court that the money came from a legitimate source or that it was going to be used for a legitimate end.

This court also doubted Miss Mase's story that she called Harlan Blackburn just to pass the time until her flight departed. One of Mr. Blackburn's known illegal activities is drug trafficking. Furthermore, the court did not believe Miss Mase's testimony that, along with giving money to her brother, she wanted to discuss their personal problems and the possibility of them living together and starting a business. Her flight was scheduled to leave Orlando at 5:30 p.m. The approximate flying time to Miami is one hour. She would have arrived at 6:30 p.m. and would have left Miami at approximately 7:00 p.m. to return to Orlando by 7:55 p.m. Barring any flight delays, she would have been in Miami for thirty minutes, which would have permitted her to have only a brief conversation with her brother in the airport. The court also discounted her testimony that she would have remained in Miami if she and her brother had agreed to live together and start a business. Miss Mase had no luggage with her and had left her car, her possessions, her boyfriend, and her dog in Orlando. Finally, this court questioned Miss Mase's credibility when she stated that the digital scale seized during her July arrest was merely used by her boyfriend to weigh food. Her boyfriend testified that he did not know about the scale.

### III. Conclusion

The government met its burden of proving that it had probable cause to seize the currency and initiate this forfeiture action. Miss Mase failed to prove by a preponderance of the evidence that the currency should not be subject to forfeiture. This court has no doubt that the currency seized by the government came from an illegal source and that it was used or was intended to be used for an unlawful purpose. Therefore, the $14,500.00 in United States currency is forfeited by Miss Mase to the government.

It is SO ORDERED.