UNITED STATES of America, Plaintiff,

v.

**$80,760.00 IN U.S. CURRENCY,**
Defendant.

Civ. A. No. 4–91–228–K.

United States District Court.
N.D. Texas,
Fort Worth Division.

Dec. 16, 1991.

William J. Andersen, Asst. U.S. Atty., Fort Worth, Tex., for plaintiff.

Charles F. Alario, Brooklyn, N.Y., for defendant.

## MEMORANDUM OPINION AND ORDER

BELEW, District Judge.

This court ... is not empowered to suspend constitutional guarantees so that the government may more effectively wage a "war on drugs." If that war is to be fought, those who fight it must respect the rights of individuals, whether or not those individuals are suspected of having committed a crime. By the same token, this Court is not empowered to forbid law enforcement practices simply because it considers them distasteful. *Florida v. Bostick* [—— U.S. ——], 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389, 401 (1991).

Once again, the dilemma created by the "war on drugs" confronts this Court: effective prosecution of the war forces the government to aggressively employ new weapons that burden our individual rights. One of the most effective "weapons" in the government's arsenal is the law of forfeiture. Through this obscure, but effective law, the government is able to confiscate property that drug traffickers use to further their trade, as well as any profit that may result. In recent years the government has successfully forfeited businesses, commercial real estate, family homes, vehicles, airplanes, boats, negotiable instruments, currency, bank accounts and virtually any other property linked to violation of the drug laws. Plaintiff United States brings this case under 21 U.S.C. section 881 against the Defendant, $80,760.00 in United States currency. The Plaintiff alleges that the currency is traceable in some way to a transaction involving controlled substances in violation of Title 21. Robert Molini, Vincent Beltran and John Stella claim an interest in the currency.

The instant matter is before the Court on motions by the Plaintiff and the Claimants. The Plaintiff has moved to strike the Claimants' Answer and moved for summary judgment. Plaintiff's contentions are that there are no proper claimants to the currency and the obligatory probable cause for forfeiture exists. The Claimants have cross-moved for summary judgment. Their contentions are that they are proper claimants and the currency is the fruit of an illegal seizure.

After careful consideration of the record, motions, briefs, summary judgment evidence and applicable law, the Court determines that subject to the Court's Order in this opinion, Claimants Molini, Beltran and Stella shall have standing to defend this forfeiture; therefore, Plaintiff's Motion to Strike must be denied. The Court also concludes that genuine issues remain concerning the legality of the search, seizure and pending forfeiture. Because these issues are appropriate grist for the factfinder at trial, the Court is of the opinion that the motions for summary judgment must be denied.

## I. BACKGROUND

### A. *The Search and Seizure:*[1]

On October 15, 1990, Drug Enforcement Administration ("DEA") Agents Munday and Vineyard were assigned to routine observation duties as members of the Dallas/Fort Worth Airport Task Force. At approximately 3:10 p.m. they observed the arrival of an American Airlines flight from New York City. While watching the passengers disembark they noticed the following activities of two male passengers, later identified as Robert Molini and Vincent Beltran:

> As they exited the jetway, Molini came off first followed by Beltran, however, neither made eye contact or spoke to each other. As Molini left the gate 12 area, he seemed to be waiting for someone. He hesitated, looked toward the gate arrival area, then hurriedly left. Beltran seemed to be following Molini as they passed the gate 13 area and bypassed the baggage claim area. Molini turned around several times, looking nervously behind him. Both seemed somewhat confused and worried as whether or not to make contact with each other and then looking down at the concourse floor.

Relying on previous encounters with passengers, Munday and Vineyard decided that the actions of Molini and Beltran warranted an initial encounter. The agents approached the two men and identified themselves by showing their identification.[2] Munday then asked permission to speak with them and they immediately gave their consent. Munday asked to see Molini's ticket and Molini responded that Beltran had it. Beltran looked through his luggage, found a ticket folder and handed it to

---

1. The Court derives the pertinent facts from the affidavit of Agent Munday of the Drug Enforcement Administration which is attached to the government's complaint as Exhibit A.

2. The Court does not know how this identification occurred. Munday's affidavit simply states that they said they were police officers and presented their identification.

Munday. The folder contained two, one-way cash tickets with a New York to San Diego itinerary. Munday noticed that Claimants purchased the tickets on the date of travel and "checked bag stubs" were not attached. On the basis of these preliminary observations, Munday asked if Molini and Beltran had any identification. Beltran handed Munday a valid New York driver's license in the name of Vincent Beltran and Molini provided a valid United States Passport in the name of Robert Louis Moline. Molini told Munday that although his passport indicated that his name was "Moline," it was really spelled "Molini."

Despite a match between the proffered identification and airline tickets, the agent's initial suspicions were not extinguished and they continued the questioning by delving into travel plans and personal backgrounds.[3] Molini indicated that they were travelling to San Diego to vacation and visit friends for about a week. He then added that they were travelling to San Diego to buy cars and Beltran said that he bought cars for a living.[4] However, after further questioning, Munday concluded that their story was not plausible. Beltran did not have a New York wholesale car dealer's license, they did not possess any literature pertaining to auto sales and knew very little about the business.

After assessing Molini and Beltran's "actions, nervousness,[5] flight itinerary, and overall story [sic] concerning their trip," the agents concluded that Molini and Beltran were involved in "some type of illegal activity, probably narcotics." Next, Munday asked Molini for permission to search his bag and Molini initially shrugged his shoulders in response. When Munday asked if the shrug meant yes or no, Molini answered, "I don't think I want you to

look." Munday then initiated the "next step of this interview, which included telling both of them they were not under arrest and were free to leave." Despite this third indication that they were free to leave, Molini and Beltran apparently decided to subject themselves to a more extensive interview and apparently consented to a search of their luggage.

The initial search of Molini's luggage discovered $5,000.00 in a side pouch. Munday then opened the main part of the bag and "observed several thousand dollars rubberbanded in one thousand dollar increments." Based on Munday's past encounters at the airport with drug traffickers and the currency which they routinely carry, he concluded that the suitcase contained more currency than claimed by Molini. Munday again explained that Molini and Beltran were not under arrest and were free to leave, however, this time he told them that he would take their bags to the DEA Task Force Office where a narcotics detection dog would sniff the currency.

After removing several bundles of money from Molini and Beltran's luggage, the agents took the currency to the immigration clearance area of the airport and placed it in a drawer. Then Customs canine "Jack" searched the area, located the drawer and alerted to a positive scent of narcotics. After considering the facts, Munday concluded that the $80,760.00 seized from Molini and Beltran was "proceeds of drug trafficking and/or intended to be used to purchase illegal drugs."

B. *The Administrative Claim and Judicial Condemnation:*

Citing the search of the luggage and the Munday's conclusion that the currency was "proceeds of drug trafficking and/or intended to be used to purchase illegal

---

**3.** Agent Munday's affidavit refers to this entire process as a "consensual interview" and states that both "subjects" were told that they were not under arrest and were free to leave on two different occasions by this point. Although the Court was not told what their response was to the statements that they were free to leave, it is asked to infer from the remainder of the affidavit that Molini and Beltran did not want to leave.

**4.** John Stella claims that he loaned Beltran money for this purpose.

**5.** Molini turned around several times, looking nervously behind him when he initially got off the airplane. During the initial consensual encounter Molini's legs were shaking and he used a stuttering voice. He was pale, sweating and almost fell over when he knelt down by his bag.

drugs," the DEA decided to seize the currency pursuant to 21 U.S.C. section 881(a)(6).[6] The DEA initiated "summary forfeiture" procedures against the currency and informed the Claimants that they must file an administrative claim during the applicable publication period. On December 26, 1990, Claimants filed a claim and bond in the amount of $5,000.00 with the DEA's Asset Forfeiture Section. On February 4, 1991, claimants' counsel received a letter from the DEA indicating receipt of the claim and notifying the Claimants that the matter was referred to the United States Attorney for the Northern District of Texas.

On March 29, 1991, this Court entered an Order for Warrant of Arrest of Property and for Notice. On April 1, 1991, claimants' counsel received a copy of the Complaint for Forfeiture and Order for Warrant of Arrest. Pursuant to the Court's Order publication was made on April 11, 18, and 25, 1991. On April 16, 1991, claimants' counsel mailed an Answer to the Complaint for Forfeiture to the clerk of this Court, however, the Answer was returned because it was not verified. Claimants filed a second Answer in which they each alleged their status as "intervener" and claimed an interest in the seized currency. Plaintiff correctly argues that the alleged Claimants "still have not asserted their right to defend the respondent pursuant to the requirements of Supplemental Rule C(6)."

## II. THE PLEADING REQUIREMENTS

Plaintiff argues that Claimants' failure to follow the procedure for filing a claim deprives them of standing to defend the forfeiture. Claimants argue that filing an administrative claim with the DEA satisfies the pleading requirements for judicial forfeiture. The force with which Claimants argue their complete compliance with the applicable procedure leads the Court to believe that they lack a fundamental understanding of forfeiture procedure. Because the Court believes this lack of understanding will become increasingly discernible as the government prosecutes the "war on drugs," it takes this opportunity to clarify the procedure that claimants must ordinarily follow in our federal courts.

A. *Summary Forfeiture—An Administrative Procedure:*

■ There are two kinds of forfeiture, summary and judicial. The purpose of summary forfeiture is simply to save the government the expense of prosecuting a judicial forfeiture. *United States v. Currency in the Amount of $2,857.00,* 754 F.2d 208, 211 (7th Cir.1985). Congress recognized this goal in 1844 when it enacted a forfeiture procedure that allowed the government to forfeit seized property of $100 or less in value. Act of April 2, 1844, ch. 8, 5 Stat. 653. With the exception of an increased jurisdictional amount of $500,000 or less, the procedure for summary forfeiture essentially remains the same today. *See* 19 U.S.C.S. § 1607 (1991).

"Summary forfeiture" is an administrative procedure that begins when a government agency seizes property claiming it is subject to forfeiture. 19 U.S.C.S. § 1607. Then the agency publishes notice of the seizure and its intent to forfeit the property.[7] In addition to publication notice, the agency must send written notice of the seizure, including information regarding the applicable procedures, to each party who appears to have an interest in the

---

**6.** 21 U.S.C.S. § 881(a)(6) (1991). This forfeiture provision provides in relevant part:
(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:

(6) All money, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

**7.** 19 U.S.C.S. § 1607 (agency must publish notice for three successive weeks). *See Floyd v. United States,* 860 F.2d 999, 1008 (10th Cir.1988) (notice defective where agency merely forwards papers without informing interested party that government seeks forfeiture).

seized property.[8] The government realizes the efficiency of summary forfeiture only if the agency does not receive a claim within twenty days from the date of the first publication. 19 U.S.C.S. § 1608 (1991). If the agency does not receive a claim it immediately declares a binding forfeiture and sells or disposes of the property. 19 U.S.C.S. § 1609 (1991).

A potential claimant terminates the summary forfeiture simply by filing a claim and bond with the agency. 19 U.S.C.S. §§ 1608, 1610 (1991). The sole requirement is that the claimant timely assert an interest in the property.[9] Then the agency forwards the claim and bond to the United States Attorney for the district in which the property was seized [10] who is responsible for initiating judicial forfeiture proceedings in the usual manner.[11]

B. *Judicial Forfeiture—The Role of the Supplemental Rules for Certain Admiralty and Maritime Claims:*

Upon receiving a claim that terminates a prior summary proceeding, the United States Attorney initiates "judicial forfeiture." Judicial forfeiture is a civil action *in rem*.[12] The Supplemental Rules for Certain Admiralty and Maritime Claims govern the procedures the government and potential claimants must follow.[13] Supplemental

---

8. 19 U.S.C.S. § 1607. *See Gutt v. United States,* 641 F.Supp. 603, 605–606 (W.D.Va.1986) (mere publication notice is not enough if agency knows of interested party).

9. *See infra* footnote 15 for cases stating the requisite property interest. "At this preliminary juncture, however, the claimant need not prove the full merits [of the] ... underlying claim." *United States v. One Parcel of Real Property,* 942 F.2d 74, 78 (1st Cir.1991).

10. *See United States v. United States Currency in the Amount of $23,481.00,* 740 F.Supp. 950, 953 (E.D.N.Y.1990) (removing seized property to another district does not take jurisdiction away from district where seizure occurred).

11. 19 U.S.C.S. §§ 1608, 1610 (1991). *See United States v. $8,850 in United States Currency,* 461 U.S. 555, 564–65, 103 S.Ct. 2005, 2012, 76 L.Ed.2d 143, 152 (1983) (factors indicating government sought forfeiture in reasonable time are length of delay, reason for delay, claimant's assertion of right, prejudice to claimant); *United States v. Turner,* 933 F.2d 240, 246 (4th Cir.1991) (sixteen month delay reasonable when claimant dilatory in asserting right); *United States v. Two Hundred Ninety–Five Ivory Carvings,* 726 F.2d 529, 530–31 (9th Cir.1984) (test for determining improper delay in commencing forfeiture includes evaluating length of delay, reason for delay, claimant's assertion of rights, prejudice to claimant). *But see United States v. $23,407.69 in United States Currency,* 715 F.2d 162, 166 (5th Cir.1983) (government must initiate forfeiture proceedings in prompt manner; six month period of inactivity after seizure improper).

12. *See Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 680–84, 94 S.Ct. 2080, 2090–92, 40 L.Ed.2d 452 (1974) (in rem action brought against defendant property because the property itself is "guilty" of facilitating the crime); *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1435 (11th Cir.1991) ("[a] civil forfeiture action is not an action in personam against the claimant of the property; rather, it is an action in rem against the property itself"); *United States v. Tit's Cocktail Lounge,* 873 F.2d 141, 143 (7th Cir.1989) (in rem proceeding determining government's title to property as against whole world); *United States v. $79,000.00 in United States Currency,* 801 F.2d 738, 739 (5th Cir.1986) (court's power derived from control over res).

13. *See* 21 U.S.C.S. section 881(b) (1991) (property subject to forfeiture may be seized "upon process issued pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims"); 21 U.S.C.S. section 881(d) (1991) ("law relating to seizure, summary and judicial forfeiture ... shall apply to seizures and forfeitures incurred ... under any of the provisions of this subchapter"); 28 U.S.C.S. section 2461(b) (1990) ("in cases of seizures on land the forfeiture may be enforced by a proceeding by libel which shall conform as near as may be to proceedings in admiralty"); Fed.R.Civ.P., Supp. Rule A(2) (rules apply to actions in rem and "procedure in statutory condemnation proceedings analogous to maritime actions in rem, whether within the admiralty and maritime jurisdiction or not"). *See also United States v. Four Parcels of Real Property on Lake Forrest Circle,* 870 F.2d 586, 588 (11th Cir.1989) (Supplemental Rule E(2) preempts Fed.R.Civ.P. 8); *United States v. $38,000.00 Dollars in United States Currency,* 816 F.2d 1538, 1547 (11th Cir.1987) (Fed. R.Civ.P. and Supplemental Rules provide procedural guidance in § 881 forfeiture proceedings except when inconsistency exists, then Supplemental Rules are exclusive authority); *United States v. $39,000 in Canadian Currency,* 801 F.2d 1210, 1216 (10th Cir.1986) (Supplemental Rules prevail over Fed.R.Civ.P. where dispute exists); *United States v. Fourteen (14) Handguns,* 524 F.Supp. 395, 397 (S.D.Tex.1981) (rules apply to seizures on land and subsequent statutory condemnation proceedings); *United States v. $5,372.85 United States Coin and Currency,* 283

Rule C(2) states that the forfeiture complaint "shall describe with reasonable particularity the property that is the subject of the action and state that. it is within the district." Fed.R.Civ.P., Supp.Rule C(2). When the government seeks forfeiture arising out of violations of federal statutes, "the complaint shall state the place of seizure and whether it was on land or on navigable waters, and shall contain such allegations as may be required by the statute pursuant to which the action is brought." [14]

After the United States Attorney files a complaint, the clerk of the district court immediately issues a summons and warrant for the "arrest" of the seized property. Fed.R.Civ.P., Supp.Rule C(3). Next, Plaintiff publishes notice of the action and arrest in a newspaper of general circulation. Fed.R.Civ.P., Supp.Rule C(4). The notice specifies the time within which the answer is to be filed. Supplemental Rule C(6), governing the procedures for filing a claim and answer in judicial forfeitures, states in pertinent part as follows:

The claimant of property that is the subject of an action in rem shall file a claim within 10 days after process has been executed, *or within such additional time as may be allowed by the court*, and shall serve an answer within 20 days after the filing of the claim. The claim shall be verified on oath or solemn affirmation, and shall state the interest in the property by virtue of which the claimant demands its restitution and the right to defend the action. If the claim is made on behalf of the person entitled to possession by an agent, bailee, or attorney, it shall state that the agent, bailee, or attorney is duly authorized to make the claim (emphasis added).

Fed.R.Civ.P., Supp.Rule C(6).

### C. *Analysis—Invoking the Court's Discretion in Cases Involving Mitigating Circumstances:*

■ A matter of obvious threshold importance here is the issue of "standing;" however, the issue arises in this case because of procedural defects rather than a question concerning the Claimants' interest in the currency.[15] Claimants filed a claim

---

F.Supp. 904, 905–906 (S.D.N.Y.1968) (historical basis for present forfeiture law is found in admiralty).

**14.** Fed.R.Civ.P., Supp.Rule C(2). *See* Fed.R.Civ. P., Supp.Rule E(2)(a) which further delineates the requirements for forfeiture complaints. The rule states:

In actions to which this rule is applicable the complaint shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading. Fed.R.Civ.P., Supp.Rule E(2)(a).

Thus, the complaint must contain the requisite factual basis for the government's allegation that it has probable cause to proceed with the forfeiture. *$38,000.00 in United States Currency*, 816 F.2d at 1547. Courts routinely recognize challenges to the forfeiture complaint and demand that the complaint allege sufficiently particular facts to establish a reasonable belief that the property is forfeitable. *See generally United States v. $84,740.00 U.S. Currency*, 900 F.2d 1402 (9th Cir.1990); *United States v. Pole No. 3172, Hopkinton*, 852 F.2d 636, 638 (1st Cir.1988); *$39,000 in Canadian Currency*, 801 F.2d at 1219; *United States v. $31,000 in United States Currency*, 740 F.Supp. 803 (D.N.M.1990); *United States v. Certain Real Property*, 738 F.Supp. 580, 581–

82 (D.Me.1990); *United States v. $134,752.00 United States Currency*, 706 F.Supp. 1075, 1076 (S.D.N.Y.1989); *United States v. One Ford Mustang*, 648 F.Supp. 1305, 1308 (N.D.Ind.1986); *United States v. A Parcel of Real Property*, 636 F.Supp. 142, 146–47 (N.D.Ill.1986); *United States v. Certain Real Estate Property*, 612 F.Supp. 1492, 1498 (S.D.Fla.1985); *United States v. Banco Cafetero Int'l*, 608 F.Supp. 1394, 1401 (D.C.N.Y.1985), *aff'd on other grounds, United States v. Banco Cafetero Panama*, 797 F.2d 1154 (2d Cir.1986).

**15.** The "standing" the Court discusses here is distinguishable from an analysis of Article III standing involving an interest in the property. A claimant must possess both Article III standing and statutory (Supplemental Rule C(6)) standing to contest a forfeiture. *United States v. Currency $267,961.07*, 916 F.2d 1104, 1107 (6th Cir.1990). The overwhelming majority of federal caselaw addressing the Article III standing issue indicates that a possessory interest is sufficient to confer standing on a forfeiture claimant. The rationale is that the government's demand that claimants show a "legitimate source" for the purpose of establishing standing, improperly accelerates the claimant's ultimate burden. The proper view is that the government first demonstrate probable cause sufficient to shift the burden to the claimant. *See $134,-752.00 United States Currency*, 706 F.Supp. at

and bond with the DEA sufficient to perfect their administrative claim, however, Plaintiff argues that Claimants failed to file an additional claim in the judicial forfeiture proceeding as required by Supplemental Rule C(6). The Claimants have had considerable difficulty complying with the procedures outlined above. Nevertheless, viewing the litigation in its present posture, the Court concludes that the only remaining procedural defect relevant to the matter before the Court is the Claimants' failure to timely file a second claim. The question the Court must address here is whether that failure deprives Claimants of standing to contest the forfeiture. For the reasons that follow, the Court concludes that it does not.

Plaintiff urges strict compliance with Rule C(6), a construction that denies standing for any failure to comply with the rule. In support of its contention, Plaintiff relies on the view stated by the Seventh Circuit in *United States v. Currency in the Amount of $2,857.00,* 754 F.2d 208 (7th Cir.1985). The Seventh Circuit's opinion leaves little doubt that it favors strict compliance with Rule C(6); however, this Court believes that Plaintiff overemphasizes the importance of the opinion. Although strict compliance is the proper approach in most cases, the Court concludes that it is not appropriate here. Plaintiff's reliance on the opinion is misplaced because it is far from certain that the Seventh Circuit would reach the same conclusion when reviewing a district court's exercise of Supplemental Rule C(6) discretion. *See United States v. United States Currency, the Amount of $103,387.27,* 863 F.2d 555, 561–62 (7th Cir. 1988) (district court abused its discretion when it denied claimant's request for extension of time to file a claim). As this Court emphasized above, it is within the Court's discretion to permit an extension of time to file a claim. The Seventh Circuit, in *Currency in the Amount of $2,857.00,* recognized the importance of the discretionary provision when it explained, "[i]f [the claimant] had promptly argued that his failure to file a claim was due to his mistaken belief that his prior DEA claim was sufficient, the district court could have, in its discretion, given [him] additional time to file a proper claim. The district court would not, however, have been required to do so." 754 F.2d at 215.

A year after *Currency in the Amount of $2,857.00,* the Northern District of Indiana, in *United States v. One 1980 Ford Mustang,* 648 F.Supp. 1305 (N.D.Ind.1986), had an opportunity to revisit the Seventh Circuit's "strict interpretation" of Supplemental Rule C(6).[16] Except for the district

---

1081. *See also United States v. 1977 Porsche Carrera,* 946 F.2d 30, 33 (5th Cir.1991) (standing derived from possessory interest of legal or equitable nature in seized item); *United States v. $260,242.00 United States Currency,* 919 F.2d 686, 687–88 (11th Cir.1990) (possessory interest constitutionally sufficient for claims in forfeiture actions); *Currency $267,961.07,* 916 F.2d at 1107 ("property interest less than ownership, such as a possessory interest, is sufficient to create standing"); *United States v. One 1985 Cadillac Seville,* 866 F.2d 1142, 1148 (9th Cir. 1989) (in order to grant standing, claimant's property interest must at least be of a possessory nature); *United States v. $3,799.00 in United States Currency,* 684 F.2d 674, 678 (10th Cir. 1982) (claimant must at least have actual or constructive possession); *United States v. $364,-960.00 in United States Currency,* 661 F.2d 319, 326 (5th Cir.1981) (no standing where "party challenging forfeiture is not the person in possession of the property at the time it was seized"); *United States v. One 1945 Douglas C–54 (DC-4) Aircraft,* 604 F.2d 27, 28 (8th Cir.1979) ("ownership may be defined as having a possessory interest in the res, with its attendant char-

acteristics of dominion and control"), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 294 (1982).

In *United States v. 1982 Sanger 24' Spectra Boat,* the Ninth Circuit cited a United States Supreme Court opinion as authority for the rule that "it is not necessary ... that a claimant under the forfeiture statute allege ownership. A lessor property interest such as possession creates standing." 738 F.2d 1043, 1046 (9th Cir. 1984) (citing *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). In *Jacobsen,* the Supreme Court decided that a Fourth Amendment seizure of property occurs "when there is some meaningful interference with an individual's possessory interest in that property." 466 U.S. at 113, 104 S.Ct. at 1656, 80 L.Ed.2d at 94.

16. For a similar discussion of the same issues see *United States v. Various Parcels of Real Property,* 650 F.Supp. 62, 64 (N.D.Ind.1986) (since both parties failed to comply with procedural rules, they would both have an opportunity to cure defects).

court's exercise of discretion, *One 1980 Ford Mustang* is factually identical to the earlier Seventh Circuit case. The district court explained,

> Under the instant circumstances the court normally would not be inclined to allow additional time for filing a claim with the court. The claimant has not alleged any government conduct which misled her with respect to the judicial claims procedure. Nor has she alleged any other equitable reason for allowing her to cure the failure to file a claim ... [however], the government has also failed to follow the proper procedure for pursuing a forfeiture action. Because of the government's failure to follow the procedural rules and in the interest of balancing the equitable considerations accorded to each party, the court exercises its discretion under Rule C(6), to allow claimant Rodriguez to file a new claim and answer in accordance with the Supplemental Rules.

*One 1980 Ford Mustang,* 648 F.Supp. at 1307.

After carefully surveying the law regarding the timeliness of a forfeiture claim, the Court is of the opinion that it should interpret pleadings and procedural practices under the Supplemental Rules liberally enough to allow for the Court's discretion. This approach has the advantage of ensuring that "controversies are decided on the merits." *United States v. One Urban Lot,* 885 F.2d 994, 1001 (1st Cir.1989). The Court believes that when the "goals underlying [the Supplemental Rule C(6)] time restrictions ... are not thwarted," the Court should exercise its discretion to excuse defects in the claim procedure or grant additional time for curing them. *See United States v. One Parcel of Real Property,* 942 F.2d 74, 77 (1st Cir.1991) (district courts should exercise discretion); *One Urban Lot,* 885 F.2d at 999–1000 (court may excuse absence of claim where answer con-

tains all information required by Supplemental Rule C(6)). *See also Vance v. United States,* 676 F.2d 183 (5th Cir.1982) (discussing claimant's procedural irregularities).

The underlying goal of Supplemental Rule C(6) is to prevent frivolous claims by insuring that "potential claimants come forward at an early stage in the proceeding and identify themselves." Fed.R.Civ.P., Supp.Rule C(6) (Advisory Committee Notes). Most importantly, courts should avoid prejudicing the government with last minute claims for which it had no notice. Although the Court does not advocate complete emasculation of the Supplemental Rule C(6), it does believe there are circumstances where mitigating factors warrant excusing procedural defects. It is important to emphasize that this is a developing area of the law that has received little attention from the federal courts until quite recently; nevertheless, the majority of courts that have addressed the issue agree with the discretionary mitigation approach the Court applies here.[17]

Factors that militate against strictly adhering to the ten day claim requirement of Supplemental Rule C(6) and excusing or extending the time for filing a claim, are as follows: (1) the claimant, in good faith, attempted to file a claim on time or inform the government of his interest; (2) the claimant relied to his detriment on misinformation from a government source; (3) the claimant actively pursued his interest in the seized property and expended considerable resources preparing the case for trial; (4) the claimant was acting pro se; (5) the government itself failed to follow the proper procedures; and (6) the excuse or extension would not prejudice the government. Application of these factors obviously requires a fact specific analysis prior to the court invoking its discretion. However, courts should not consider the analysis as an excessive burden: a willful failure to follow procedures or complete disregard

---

**17.** *See, e.g., United States v. Borromeo,* 945 F.2d 750, 753 (4th Cir.1991); *One Parcel of Real Property,* 942 F.2d at 78; *United States v. Dairy Farm,* 918 F.2d 310, 312 (1st Cir.1990); *$103,387.27,* 863 F.2d at 561–62; *United States v. $149,345,* 747 F.2d 1278, 1282 (9th Cir.1984); *United*

States v. Tract of Land Described as Map 2535,* 726 F.Supp. 274 (D.Or.1989); *United States v. One (1) 1979 Mercedes 450 SE,* 651 F.Supp. 351 (S.D.Fla.1987); *United States v. One 1979 Oldsmobile Cutlass Supreme,* 589 F.Supp. 477 (N.D.Ga.1984).

for procedural requirements compels a denial of standing. For example, if claimants never attempt to assert their interest or fail to respond to the government's motions, strict adherence to Rule C(6) is appropriate. The instant case presents mitigating factors sufficient to relieve claimants of the consequences of their procedural error.

Claimants do not proceed pro se in this litigation; nevertheless, they have repeatedly stumbled in their attempts to protect their interest in the defendant currency. The Court does not consider this opinion the appropriate forum for criticism; instead, it simply states that this litigation is not a model for emulation by future forfeiture claimants. A thorough review of the record convinces the Court that Claimants' procedural errors are the result of Claimants' hopeless confusion rather than their bad faith. Claimants have obviously expended considerable resources pursuing their interest, responding to motions and, more significantly, correcting numerous filing errors.

The Court is not aware of any prejudice that would result from granting Claimants leave to reassert their claims. Plaintiff knew of Claimants' interest on the date it filed its complaint and the Court assumes active participation in discovery until February 28, 1992, the date that discovery closes. Plaintiff has sufficient notice to preclude a claim of prejudice. As the Court discusses below, Plaintiff's motion does not establish the requisite probable cause to forfeit. The absence of probable cause at this point in the litigation is yet another reason to invoke the Court's discretion.

## III. AIRPORT DETENTION—INVOKING THE FOURTH AMENDMENT IN JUDICIAL FORFEITURES

■ Having found that Claimants may possess standing to contest this forfeiture,

the Court must now turn to the issue of whether the alleged illegal detention, search and seizure warrants summary judgment for Claimants. The Court concludes that under the facts and circumstances of this case, the alleged illegalities are not properly before the Court. Instead, the Court reserves a ruling on this issue until a suppression hearing or section 881(d) forfeiture proceeding.

An in rem forfeiture proceeding is quasi-criminal in nature. *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886) (though they may be civil in form, they are by their nature criminal). For this reason, courts must apply many of the constitutional considerations that arise in criminal cases.[18] Of particular relevance is the Supreme Court's decision in *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965), holding that the exclusionary rule applies to forfeiture proceedings. *See United States v. One Mercury Cougar XR-7*, 666 F.2d 228, 230 (5th Cir.1982). However, an illegal search and seizure does not always "jeopardize the government's right to secure forfeiture if the probable cause to seize the ... [property] can be supported with untainted evidence." *United States v. Monkey*, 725 F.2d 1007, 1012 (5th Cir.1984). *See United States v. $252,-671.48 In United States Currency*, 734 F.Supp. 254, 257 (N.D.Tex.1990).

Claimants argue that Munday exceeded the bounds of reasonableness by detaining them at the airport, subjecting them to extensive questioning and ultimately searching their luggage. Normally, the Court addresses four issues when analyzing the legality of airport detentions. "They are: (1) whether and when a seizure occurred;[19] (2) if a seizure occurred, whether reasonable suspicion existed at the

**18.** *See United States v. United States Coin and Currency*, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971) (fifth amendment privilege against self incrimination); *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965) (fourth amendment prohibition of unreasonable searches and seizures).

*But see United States v. Regan*, 232 U.S. 37, 34 S.Ct. 213, 58 L.Ed. 494 (1914) (criminal burden of beyond reasonable doubt does not apply).

**19.** The Fifth Circuit has identified three tiers of police-citizen contact: (1) mere communication without detention or coercion that doesn't im-

time of the seizure; (3) whether the defendant voluntarily consented to the search and/or seizure; and, (4) if the Defendant voluntarily consented but the seizure, if any, was illegal, whether the search was the infected product of an illegal seizure." *United States v. Price*, 680 F.Supp. 833, 835 (N.D.Tex.1988). *See United States v. Gallagher*, 714 F.Supp. 811 (N.D.Tex.1989). Although it seems quite clear that Claimants consented to the initial encounter, the Court finds several issues regarding this search and seizure somewhat troubling. First, Munday told Claimants that they were not under arrest and were free to leave on three different occasions prior to the search. Nevertheless, Claimants remained at the airport and subjected themselves to further questioning. Second, Munday compared Claimants' airline tickets to their personal identification and found no discrepancies that would indicate intentional deception. At this point the Court simply notes that law enforcement "officers are not free to ignore facts which tend to dispel their suspicions." *Price*, 680 F.Supp. at 843. *See Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir.1988), *cert. denied*, 488 U.S. 851, 109 S.Ct. 135, 102 L.Ed.2d 108 (1988). Third, in response to a request for consent to search, Molini told Munday, "I don't think I want you to look." Despite this rather clear indication that Molini refused consent, Munday insists that consent was voluntarily given later in the "interview." The facts leave some doubt about whether a valid search and seizure occurred in this case. Despite that doubt the Court, at this time, refrains from deciding whether or not an illegal seizure occurred.

As the Supreme Court explained in *One 1958 Plymouth Sedan*, the exclusionary rule applies in full force to forfeiture actions. Therefore, the proper procedure is to test the legality of a seizure by filing a motion to suppress. *United States v. $321,470.00, United States Currency*, 874 F.2d 298, 300 (5th Cir.1989); *United States v. $124,570*, 873 F.2d 1240, 1242 (9th Cir. 1989); *United States v. $83,900.00 In Unit-*

*ed States Currency*, 774 F.Supp. 1305 (D.Kan.1991); *United States v. $191,910 In United States Currency*, 772 F.Supp. 473, 475 (N.D.Cal.1991); *United States v. $639,558*, 751 F.Supp. 6, 8 (D.D.C.1990). In *Jonas v. City of Atlanta*, a Fifth Circuit case discussing the application of the exclusionary rule, the court explained, "in a proceeding for forfeiture of an article used in violation of the criminal law, the balance is struck in favor of the person from whom the evidence is illegally seized. Because forfeiture is clearly a penalty for transgressing the criminal laws, exclusion of illegally seized evidence is thought to obtain the same deterrent effect as exclusion in a criminal proceeding." 647 F.2d 580, 587–88 (5th Cir.1981). The propriety of this procedure seems obvious: the Court entertains the motion to suppress by conducting an evidentiary hearing and entering its findings. In conducting a suppression hearing the Court resolves all issues regarding the fourth amendment claim prior to the forfeiture trial and, if appropriate, the exclusionary rule precludes admission of tainted evidence. Here, Claimants' summary judgment motion makes bald assertions, conclusory statements and presents hypothetical queries that the Court interprets as smokescreen rather than an honest attempt to evaluate an important constitutional issue.

As the Supreme Court recently warned, "citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse." *Florida v. Bostick,* ⎯ U.S. ⎯, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991). Thus, the inquiry the Court must undertake is whether a reasonable person would have felt free to decline the agent's requests or otherwise terminate the encounter and whether Claimants chose to permit the search of their luggage. *Id.* The Court reserves that inquiry for a later date. Even assuming the legality of the detention, the issue of whether Claimants consented to the search of their luggage is

---

plicate the fourth amendment; (2) brief investigatory stops supported by reasonable suspicion; and (3) full scale arrests supported by probable

cause. *United States v. Hanson*, 801 F.2d 757, 761 (5th Cir.1986).

a question of fact precluding summary judgment.

## IV. PROBABLE CAUSE—THE FORFEITURE STANDARD

■ Next, the Court must address Plaintiff's contention that it should grant summary judgment because there is a sufficient showing of probable cause to forfeit. As the Supreme Court has observed, "the inquiry involved in a ruling on a motion for summary judgment ... necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In forfeiture actions the government's burden is to demonstrate probable cause for the belief that a substantial connection exists between the defendant property and illegal drug dealing. *See United States v. One 1987 Mercedes 560 SEL*, 919 F.2d 327, 331 (5th Cir.1990) (citing *United States v. $4,255,625.39*, 762 F.2d 895, 903 (11th Cir.1985), *cert. denied*, 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986)); *United States v. One 1980 Rolls Royce*, 905 F.2d 89, 90 (5th Cir.1990); *United States v. $64,000.00 in United States Currency*, 722 F.2d 239, 244 (5th Cir.1984). *See also United States v. Real Property and Residence at 3097 S.W. 111th Ave.*, 921 F.2d 1551, 1555–56 (11th Cir.1991); *United States v. $95,945.18, United States Currency*, 913 F.2d 1106, 1110 (4th Cir. 1990); *United States v. United States Currency in the Amount of $228,536.00*, 895 F.2d 908, 916 (2d Cir.1990), *cert. denied*, 495 U.S. 958, 110 S.Ct. 2564, 109 L.Ed.2d 747 (1990). Probable cause to believe the property is related to "some" illegal activity does not permit its forfeiture. *United States v. $38,600.00 in United States Currency*, 784 F.2d 694, 698–99 (5th Cir.1986). This circuit defines probable cause to forfeit as "reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion." *United States v. One 1978 Chevrolet Impala*, 614 F.2d 983, 984 (5th Cir. 1980). The government can establish the requisite probable cause by resorting to circumstantial or hearsay evidence. *One*

*1987 Mercedes 560 SEL*, 919 F.2d at 331. Once the government establishes probable cause, the burden shifts to the claimant to prove by a preponderance of the evidence that the money came from an independent, non-drug-related source. *See One 1980 Rolls Royce*, 905 F.2d at 90; *United States v. One 1986 Nissan Maxima GL*, 895 F.2d 1063, 1065 (5th Cir.1990).

In this case Claimants present arguments consisting of nothing more than general denials to the facts. Normally, such summary judgment evidence is insufficient to defeat the government's motion, therefore, the Court begins with the proposition that summary judgment should be granted if the government satisfies its probable cause burden. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Isquith v. Middle*, 847 F.2d 186, 199 (5th Cir.1988), *cert. denied*, 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988). Facts elicited from Munday's affidavit are the sole evidence of that burden. The Court summarizes those facts as follows: (1) Claimants exhibited characteristics of the drug-courier profile; and (2) a narcotics detection dog alerted to the scent of narcotics on the currency. The issue the Court must resolve here is whether the government, construing the evidence in the light most favorable to the Claimants, has shown more than mere suspicion that a substantial connection exists between the currency and the sale of drugs.

After conducting a thorough survey of cases analyzing drug-related forfeitures, the Court concludes that the facts before it fail to satisfy the government's burden. Although Claimants did not come forward with evidence of a non-drug-related source, the Plaintiff cannot prevail as a matter of law at this time. As the Court discusses below, recitation of the profile elements and the alert of a narcotics detection dog, without more, does not establish probable cause to forfeit. The facts before the Court are easily distinguishable from other cases permitting forfeiture. Drug-related forfeitures can be divided into three categories: (1) close proximity cases where officers find the property with illegal drugs or

determine through investigation that it is very closely related to illegal drug dealing; (2) cases relying on less persuasive evidence that is sufficient under the totality of the circumstances; and (3) cases improperly relying on mere suspicion. The instant case falls into the third category.

The categorical distinctions the Court makes here are not novel in this circuit. In *United States v. $38,600.00 in United States Currency*, 784 F.2d 694 (5th Cir. 1986), the Fifth Circuit used the same approach to determine whether currency found with drug residue and paraphernalia sufficed for probable cause. As this Court's analysis below indicates, "a large amount of money, found in combination with other persuasive circumstantial evidence, particularly the presence of drug paraphernalia, is frequently held sufficient to establish probable cause." *Id.* at 698. However, in explaining the inherent factual distinctions in forfeiture cases, the *$38,-600.00* court stated:

> [T]he discovery of a pipe bearing marijuana residue and rolling papers, while relevant, is certainly not as compelling as the evidence presented in the many other reported cases which disclosed that the defendants had either admitted the money's intended purpose or could be linked to narcotics transactions by testimony of past drug-related activities, more incrimi-

nating drug paraphernalia, or the discovery of actual drugs.

*Id.*

The court concluded that

> the $38,600 discovered in ... [the claimant's] car, even when considered in conjunction with the pipe and rolling papers and ... [the claimant's] evasiveness concerning his destination and the money's owner, is insufficient to sustain the district court's finding [of forfeiture]. As we have earlier suggested, this evidence may very well give rise to a reasonable belief that there exists a connection between the money seized and *some* illegal activity; here, however, the evidence gives rise only to a suspicion of a connection between the money seized and its use in a transaction for a controlled substance.

*Id.* at 699.

In the first category, representing the most compelling case for forfeiture, are those situations where law enforcement finds the property in close proximity to narcotics or determines through investigation that it is clearly forfeitable. Law enforcement officers demonstrate this proximity through surveillance,[20] undercover purchases,[21] execution of valid search warrants,[22] arrests, guilty pleas and convic-

---

**20.** *See, e.g., United States v. Real Property and Residence at 3097 S.W. 111th Ave.*, 921 F.2d 1551, 1552 (11th Cir.1991); *United States v. Lot 9, Block 2 of Donnybrook Place*, 919 F.2d 994, 996–97 (5th Cir.1990); *United States v. $95,-945.18, United States Currency*, 913 F.2d 1106, 1107 (4th Cir.1990); *United States v. United States Currency, the Amount of $228,536.00*, 895 F.2d 908, 913 (2d Cir.1990), *cert. denied,* —— U.S. ——, 110 S.Ct. 2564, 109 L.Ed.2d 747 (1990); *United States v. Padilla*, 888 F.2d 642, 644–45 (9th Cir.1989); *United States v. $41,305.00 in Currency*, 802 F.2d 1339, 1341 (11th Cir.1986); *United States v. $2,500 in United States Currency*, 689 F.2d 10, 12 (2d Cir.1982), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984); *United States v. United States Currency: $24,927*, 635 F.Supp. 475, 476–78 (S.D.Ohio 1986).

**21.** *See, e.g., United States v. One Lot of United States Currency ($68,000)*, 927 F.2d 30, 31–32 (1st Cir.1991); *$95,945.18, United States Currency*, 913 F.2d at 1107; *United States v. Thomas,*

913 F.2d 1111, 1113 (4th Cir.1990); *United States v. $250,000 in United States Currency*, 808 F.2d 895, 898 (1st Cir.1987); *Boas v. Smith*, 786 F.2d 605, 606 (4th Cir.1986); *United States v. One Household Finance Check*, 769 F.Supp. 69, 71 (D.Conn.1991); *United States v. $12,585.00 in United States Currency*, 669 F.Supp. 939, 940 (D.Minn.1987), *aff'd in part, United States v. Premises Known as 3639–2nd St.*, 869 F.2d 1093 (8th Cir.1989).

**22.** *See, e.g., United States v. $29,959.00 United States Currency*, 931 F.2d 549, 550 (9th Cir. 1991); *United States Currency, the Amount of $228,536.00*, 895 F.2d at 913; *United States v. $5,644,540.00 in United States Currency*, 799 F.2d 1357, 1359 (9th Cir.1986); *United States v. $40,000 in United States Currency*, 763 F.Supp. 1423, 1427 (S.D.Ohio 1991); *United States v. $24,000 in United States Currency*, 722 F.Supp. 1386, 1388–89 (N.D.Miss.1989), *aff'd,* 902 F.2d 956 (5th Cir.1990); *United States v. $33,000 United States Currency*, 640 F.Supp. 898, 899 (D.Md.1986).

tions for narcotics offenses.[23] In each of these situations there is an underlying investigation that substantiates the government's burden. However, as the Court explained above, the government often resorts to other, less persuasive evidence to show its burden. Thus, in the second category of cases, corroboration of an informant's tip,[24] testimony of witnesses,[25] presence of drug paraphernalia,[26] use of an alias in a deliberate attempt to deceive law enforcement,[27] discovery of records documenting drug transactions,[28] and admissions,[29] have all been persuasive factors in the probable cause determination. These two categories demonstrate that in cases where courts ordered drug related forfeitures, the evidence supporting the order was far stronger than in the case at bar.

The third category of cases are those that rely on mere suspicion. Our courts have denied forfeiture in these *rare* cases where the evidence indicates that there *may* be a connection between the currency and *some* illegal activity, but does not give rise to the "substantial connection" necessary for forfeiture. It would be erroneous for the Court to require any particular combination of evidence, rather, it is quite clear that if the government intends to prevail in forfeiture cases it must present a more

**23.** *See, e.g., United States v. Certain Real and Personal Property Belonging to Hayes,* 943 F.2d 1292, 1294 (11th Cir.1991) (narcotics conviction); *United States v. $1,322,242.58,* 938 F.2d 433, 435 (3d Cir.1991) (guilty plea to narcotics offense); *One Lot of United States Currency ($68,000),* 927 F.2d at 31–32 (narcotics conviction); *$41,305.00 in Currency,* 802 F.2d at 1341–42 (narcotics arrest); *United States v. One Porsche 928,* 732 F.Supp. 447, 452 (S.D.N.Y.1990) (post arrest statements).

**24.** *See, e.g., United States v. Certain Real Property,* 943 F.2d 721, 722 (7th Cir.1991); *United States v. One Single Family Residence Located at 15603 85th Ave. North,* 933 F.2d 976, 979 (11th Cir.1991); *One Lot of United States Currency ($68,000),* 927 F.2d at 31; *$95,945.18, United States Currency,* 913 F.2d at 1107; *United States v. $5,743.00,* 739 F.Supp. 1354, 1355 (E.D.Mo. 1990).

**25.** *See, e.g., $1,322,242.58,* 938 F.2d at 435 (DEA received information concerning claimant's drug smuggling activities from agents in another city); *United States v. $37,780 in United States Currency,* 920 F.2d 159, 160–61 (2d Cir. 1990) (investigation following DEA seizure discovering claimant under investigation by local authorities for narcotics trafficking); *United States v. $215,300 United States Currency,* 882 F.2d 417, 418 (9th Cir.1989) (testimony indicated claimant was drug dealer in Miami), *cert. denied,* —— U.S. ——, 110 S.Ct. 3242, 111 L.Ed.2d 752 (1990); *United States v. $144,-600.00, United States Currency,* 757 F.Supp. 1342, 1346 (M.D.Fla.1991) (claimant under investigation by other law enforcement agencies).

**26.** *See, e.g., Certain Real Property,* 943 F.2d at 722 (cocaine, marijuana plants, paraphernalia, hidden room); *$29,959.00 United States Currency,* 931 F.2d at 550 (drugs, scanner, scales); *Turner,* 933 F.2d at 244 (cocaine and paraphernalia in plain view between seat of car); *United States v. $148,215.00 in United States Currency,* 768 F.Supp. 525, 528 (W.D.N.C.1991) (tools of

drug trafficking trade); *$24,000 in United States Currency,* 722 F.Supp. at 1388–89 (suitcase containing drugs, scale, other paraphernalia); *United States Currency: $24,927,* 635 F.Supp. at 476–78 (revolver, drugs, scales, plastic bags, heat sealer).

**27.** *See e.g., United States v. $91,960.00,* 897 F.2d 1457, 1459–60 (8th Cir.1990); *$5,644,540 in United States Currency,* 799 F.2d at 1360; *United States v. $100,000.00,* 761 F.Supp. 672, 673–74 (E.D.Mo.1991); *United States v. $175,260,* 741 F.Supp. 45, 47–48 (E.D.N.Y.1990); *United States v. $288,914 in United States Currency,* 722 F.Supp. 267, 268–69 (E.D.La.1989); *United States v. United States Currency Totalling $92,-000.00,* 707 F.Supp. 540, 541 (N.D.Ga.1989); *United States v. $29,500.00 United States Currency,* 677 F.Supp. 1181, 1182–83 (N.D.Ga.1988), *aff'd,* 866 F.2d 1423 (11th Cir.1989).

**28.** *See, e.g., $91,960.00,* 897 F.2d at 1459–60 (claimant's briefcase contained money, section of telephone book, list of names corresponding to figures which appeared to be records of drug transactions); *$41,305.00 in Currency,* 802 F.2d at 1341 (currency found with tax returns, records of drug transactions).

**29.** *See, e.g., One 1980 Rolls Royce,* 905 F.2d at 90 (claimant admitted that $15,000 of money used to purchase seized property was proceeds of his drug trafficking activity); *$250,000 in United States Currency,* 808 F.2d at 898 (claimant boasted about money and real estate accumulated as a result of drug trafficking); *$175,260,* 741 F.Supp. at 47–48 (claimant admitted at forfeiture trial that he lied to DEA); *United States v. One 1982 Porsche 928,* 732 F.Supp. 447, 449 (S.D.N.Y.1990) (following arrest claimant admitted that car purchased with $20,000 made through narcotics trafficking); *United States v. $87,375 in United States Currency,* 727 F.Supp. 155, 158 (D.N.J.1989) (claimant, acting as courier, said currency represented proceeds from illegal narcotics trafficking).

persuasive connection to drug law violations than it presents here.

## A. The Drug-courier Profile:

Plaintiff relies on the applicability of the "drug-courier profile" as partial support for its claim of probable cause. Agent Munday's conclusion that Claimant's were engaged in narcotics trafficking is, in part, based on the following facts: (1) Claimants acted nervous and watchful as they entered the airport concourse; (2) they purchased a one-way ticket; (3) the ticket was purchased for cash; (4) Claimants were arriving at a "source city" for drugs; (5) Claimants did not check luggage, rather, they each carried one medium carry-on suitcase; and, (6) they carried $80,760.00.[30] An important distinction between the instant case and others discussing the profile is that the characteristics are normally used to justify brief investigatory stops, rather than probable cause for forfeiture. In this circuit it is well settled that a statement of profile characteristics will "not, in and of itself, create a reasonable suspicion." *United States v. Hanson*, 801 F.2d 757, 762 (5th Cir.1986). As the Supreme Court concluded in *Reid v. Georgia*, the profile character-istics "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the court to conclude that as little foundation as [the profile characteristics] could justify a seizure." 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980). Profile characteristics are of little value in the forfeiture context without other persuasive evidence establishing the requisite substantial connection. Even if the tenuous suspicions here justify a brief stop, they surely do not rise to the level required for probable cause to forfeit. The Court must demand more in order to avoid the random seizures condemned by the Supreme Court in *Reid*.[31]

## B. Drug Dog's Alert:

The Court must next decide whether adding a narcotics detection dog's alert to the equation establishes probable cause. Use of dogs for detecting narcotics presents two issues in the currency forfeiture context. The First issue concerns the general contamination of United States currency. There is some indication that residue from narcotics contaminates as much as 96% of the currency currently in circulation.[32]

---

**30.** These facts are a partial restatement of the profile characteristics. The complete list of the characteristics is as follows:

> The seven primary characteristics are: (1) arrival from or departure to an identified source city; (2) carrying little or no luggage, or large quantities of empty suitcases; (3) unusual itinerary, such as rapid turnaround time for a very lengthy airplane trip; (4) use of an alias; (5) carrying unusually large amounts of currency in the many thousands of dollars, usually on their person, in briefcases or bags; (6) purchasing airline tickets with a large amount of small denomination currency; and (7) unusual nervousness beyond that ordinarily exhibited by passengers.
> The secondary characteristics are (1) the almost exclusive use of public transportation, particularly taxicabs, in departing from the airport; (2) immediately making a telephone call after deplaning; (3) leaving a false or fictitious call-back telephone number with the airline being utilized; and (4) excessively frequent travel to source or distribution cities.
> *United States v. Berry*, 670 F.2d 583, 599 (5th Cir.1982) (Unit B) (en banc).

**31.** Of particular importance here is the absence of deliberate deception. Although Claimants gave inconsistent and sketchy stories about their trip, the evidence clearly demonstrates that they were not travelling under assumed names.

**32.** *See United States v. $87,375 in United States Currency*, 727 F.Supp. 155, 160 (D.N.J.1989). Jay Poupko, Ph.D., testified as an expert toxicologist and the court summarized his testimony as follows:

> [H]e used a chemical analysis to study the presence of cocaine residue on currency in several regions of the United States. After analyzing random samples of currency in varying denominations from banks throughout the Northeast, including New Jersey and New York, Dr. Poupko concluded that all the bills contained cocaine residue. All of the currency analyzed by Dr. Poupko was used currency ... Dr. Poupko testified that cocaine can easily be transferred from one object to another due to its physical properties.
> *Id.*
> Despite Dr. Poupko's testimony, the court pointed out that he had not tested the seized currency and had not studied the amount of residue required to create the requisite scent for a canine alert. *Id.*
> *See also Virtually all U.S. paper money is contaminated with cocaine*, Albany Times Union, August 12, 1991, three star first edition, at A–8. "Over a seven-year period, Dr. Jay Poupko

Even assuming a much lower percentage of contamination, the Court seriously questions the value of a dog's alert without other persuasive evidence of the kind set forth in categories one and two above. Recent court decisions indicate that probable cause for forfeiture requires the government to do more than merely subject currency to a drug dog search or chemical analysis. *See United States v. $53,082.00 In United States Currency,* 773 F.Supp. 26, 33–34 (E.D.Mich.1991) (airport detention supported by drug-courier profile and canine search for currency not enough); *United States v. $13,000 In United States Currency,* 747 F.Supp. 430, 433 (S.D.Ohio 1990) (despite canine alert and drug courier profile, genuine issue remains for trial); *In re Forfeiture of $18,000,* 189 Mich.App. 1, 471 N.W.2d 628 (1991) (dog alerted on cash bail bond withdrawn from local bank); *In re $27,440,* 164 Ill.App.3d 44, 115 Ill.Dec. 293, 517 N.E.2d 704 (1987) (chemical analysis of currency discovering residual amount of cocaine not visible to the naked eye), *appeal denied,* 119 Ill.2d 574, 119 Ill.Dec. 396, 522 N.E.2d 1255 (1988).

Apparently, Plaintiff's argument is that a violation of the drug laws occurred at some time in the past when the currency came in contact with narcotics or was handled by someone using narcotics. It is important to note, however, the absence of evidence that Claimants caused the contamination. Also of relevance is the fact that Munday and Vineyard did not seize narcotics from Claimants, rather, the sole evidence of narcotics came from the scent produced by trace residue on the currency.

In cases involving the forfeiture of conveyances, courts have held that the amount of contraband found on the conveyance is not controlling.[33] However, in each of those cases the contraband was observable, as well as usable, and the court analyzed the totality of the circumstances. Similarly, courts have refused to prosecute defendants for possession of controlled substances where the sole evidence is unusable residue.[34] In *United States v. One Gates Learjet,* 861 F.2d 868 (5th Cir.1988), the Fifth Circuit reversed a forfeiture supported by a drug dog's alert, chemical analysis and hearsay testimony. The pertinent facts were as follows:

> The aircraft was bound from Mexico to Houston, Texas where it was to be shown to prospective buyers. An initial search by customs officers disclosed no contraband, however, a Drug Enforcement Agent, alerted that the aircraft had been mentioned in ... [a DEA intelligence unit's report], conducted a second search. Although the second search was also fruitless, the DEA agent sought the assistance of a Customs Service detector-dog ... [T]he dog reportedly "alerted" in two parts of the plane's interior, the cargo area and the aisle.

*Id.* at 869.

In addition to the dog alert, the DEA conducted the following tests:

> A DEA chemist was then called in to do a vacuum search and analysis. The aircraft was vacuumed with special equipment and the gleanings were tested. The chemist reported finding a trace of cocaine in the vacuumed dust. The quantity of the cocaine trace was three-

---

and his colleagues at Toxicology Consultants Inc. in Miami have repeatedly tested currency in Austin, Dallas, Los Angeles, Memphis, Miami, Milwaukee, New York City, Pittsburgh, Seattle and Syracuse." *Id.* "An average of 96 percent of all the bills ... analyzed ... tested positive for cocaine." *Id.* Similarly, "[s]cientists at National Medical Services in Willow Grove, Pa., who tested money from banks and other legal sources more than a dozen times consistently found cocaine on more than 80 percent of the bills." *Id.*

**33.** *See Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452; *United States v.*

*One 1976 Porsche,* 670 F.2d 810 (9th Cir.1979); *United States v. One 1957 Oldsmobile Auto,* 256 F.2d 931 (5th Cir.1958).

**34.** *See King v. Collins,* 945 F.2d 867 (5th Cir. 1991). For a comprehensive review of the law relating to this issue see *Harbison v. State,* 302 Ark. 315, 790 S.W.2d 146 (1990). *See also $38,-600.00 in United States Currency,* 784 F.2d at 698–99 (presence of residue and large amount of currency does not establish probable cause for forfeiture); *$134,752.00 United States Currency,* 706 F.Supp. at 1083–84 (forfeiture improper where only evidence is residue in viles and large amount of currency).

to-four milligrams, or 10-to-$^{14}\!/_{100,000}$ of one ounce and was so small as to be unusable as a drug. The trace was not visible to the naked eye, alone or aided by a powerful microscope and was measurable only through sophisticated scientific procedures.

*Id.*

Other evidence indicated that the owners had a continuing relationship with drug traffickers, regularly purchased property for a suspected large-scale drug dealer and, in fact, purchased the aircraft for the dealer. *One Gates Learjet,* 861 F.2d at 869–70. In addition, a DEA agent testified that the plane's log listed known drug dealers as frequent passengers. *Id.* at 870. Based on this evidence, the government sought forfeiture under 21 U.S.C. sections 881(a)(4) and 881(a)(6). The court rejected forfeiture under section 881(a)(6), and stated "[w]e find no probative evidence to base even a reasonable inference that there was a substantial connection between the acquisition of the Learjet and the trafficking of a controlled substance. We find no basis for forfeiture under 21 U.S.C. § 881(a)(6)."[35] Thus, the mere fact that a dog alerts to the currency, without other probative evidence linking the currency to violation of the drug laws, will not support forfeiture.

Recently reported cases support the Court's conclusion that the government must come forward with more than the drug-courier profile and a narcotics detection dog's alert to establish a "substantial connection." In each of these cases there was an "alert" which was corroborated by other probative evidence of a substantial connection. *See United States v. $14,500.00 In United States Currency,* 767 F.Supp. 1123, 1125–26 (M.D.Fla.1991) (air-

port detention based on drug courier profile, telephone calls to well-known Orlando criminal, subsequent investigation leading to arrest of claimant for possession of cocaine, search of residence discovered paraphernalia); *United States v. $100,000,* 761 F.Supp. 672, 673–75 (E.D.Mo.1991) (airport detention based on drug courier profile, travelling under alias, money concealed in underwear, tools of drug trafficking trade in luggage); *United States v. South Side Finance, Inc.,* 755 F.Supp. 791, 793–94 (N.D.Ill.1991) (information from informants indicating defendant business operating as cocaine supplier, DEA investigation, surveillance, search warrant); *United States v. $46,559.00 In United States Currency,* 758 F.Supp. 613, 614–15 (D.Or.1990) (false identification, stolen 9mm pistol, .357 revolver, paraphernalia, drugs); *United States v. $252,671.48 In United States Currency,* 734 F.Supp. 254, 258 (N.D.Tex. 1990) (affidavit of coconspirator, use of alias, search warrant, odor of drugs); *United States v. $25,055.00,* 728 F.Supp. 1406, 1407 (E.D.Mo.1990) (airport detention based on drug courier profile, mobile telephone and drugs seized, subject wanted for misdemeanor narcotics charge, subject admitted claimant wanted him to transport currency, DEA investigation subsequent to seizure, informant's information that subject worked with claimant in narcotics trafficking). The *$14,500.00 In United States Currency* court explained its forfeiture order as follows: "although the Court agrees that money can become tainted from various sources and that the bag itself may have been tainted, *when considered with the other evidence in this case,* ... [the claimant's] defenses were ineffectual in convincing this court that the money came

---

**35.** *One Gates Learjet,* 861 F.2d at 872. With respect to § 881(a)(4), the court explained its rationale for denying forfeiture as follows:

No case has been cited to us, and we find none, where the quantity of contraband was so minute as to be invisible to the naked eye, even the naked eye aided by a large magnifying glass. The chemist testified that the trace was so small that its presence could only be detected by complicated scientific procedures. The chemist conceded that the quantity could have been brought on board the aircraft on

the shoe of a passenger or crew member and that the presence of the contraband could not have been detected other than by the procedures he used. The amount in question was too small to be possessed, used, exchanged, or enhanced. That amount, without more, will not support the showing of probable cause required for a § 881(a)(4) forfeiture. Nor is the other evidence presented by the government sufficient to show a violation of the law of the United States.
*Id.*

from a legitimate source." 767 F.Supp. at 1127 (emphasis added).

The second issue presented by the government's use of narcotics detection dog's is the reliability of the dog. Reliability problems arise when the dog receives poor training, has an inconsistent record, searches for narcotics in conditions without reliability controls or receives cues from its handler.[36] Here, the available evidence indicates that the agents placed the currency in a drawer and "U.S. Customs Inspector Abelardo Santibanez, utilizing K–9 'Jack' (C–453) searched the area. K–9 'Jack' located the currency, alerting for a positive scent to narcotics on the currency." The Court was not told of Jack's training and success in past searches. Nor does it appear that the agents verified Jack's alert by conducting a "sterile run," placing the currency in a different location, substituting a different material (preferably used cash withdrawn from a banking institution) or conducting a second search with a different dog. Verification, supported by testimony of the dog's handler, is an essential prerequisite to consideration of the evidence.[37]

The Court finds that Under the totality of the circumstances, Plaintiff's case rests on skeletal facts representing the least persuasive indicators of probable cause. When the government seeks forfeiture of currency under section 881(a)(6) it must do more than recite the drug-courier profile and subject the currency to a narcotics detection dog's sniff test. Even though Plaintiff did not make a sufficient showing of probable cause, this case is by no means at an end. Plaintiff need not divulge its entire case in a pre-trial motion and it can use evidence developed after the initial seizure to establish probable cause. *See United States v. $37,780 in United States Currency*, 920 F.2d 159, 163 (2d Cir.1990) (government "need not demonstrate probable cause until the forfeiture trial); *United States v. Monkey*, 725 F.2d 1007, 1011 (5th Cir.1984) (evidence developed after seizure admissible at trial). Since the Court herein denies Plaintiff's motion, the issue of probable cause remains for trial.

**36.** In *United States v. Trayer*, "Thomas Knott, ... [a] retired Baltimore police dog trainer, testified that it is possible for a handler through voice or physical cues to compromise a dog's objectivity." 898 F.2d 805, 807–808 (D.C.Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 113, 112 L.Ed.2d 83 (1990). The court responded to his testimony as follows:

Given the reliance that this and other courts have placed on the results of dog sniffs in reviewing probable cause determinations, we find Knott's testimony quite troubling ... we are mindful that less than scrupulously neutral procedures, which create at least the possibility of unconscious "cuing", may well jeopardize the reliability of dog sniffs. *Id.*

**37.** *See $215,300 United States Currency*, 882 F.2d at 419 ("uncontradicted trial testimony established that the particular police dog had an unblemished record for detecting narcotics, and the police had taken the necessary precautions to insure a reasonable probability of proper identification and lack of tampering"); *United States v. Rackley*, 742 F.2d 1266, 1272 (11th Cir.1984) (approving district court's use of in-court reliability experiment); *$100,000.00*, 761 F.Supp. at 675 (currency placed in one of three new and identical cardboard boxes, boxes placed in different locations within room); *South Side Finance, Inc.*, 755 F.Supp. at 794 (test conducted under controlled conditions); *$175,-260*, 741 F.Supp. at 46 (dog handler testified about search procedure and dog's reliability).

The procedure followed by a Customs Special Agent in *$87,375 in United States Currency* is an example that others should emulate:

Officer Eichmann had worked with Coco for approximately seven years. Coco completed the narcotics detection training program for canines at the Custom Service's facility in Front Royal, Virginia in 1980. Coco also demonstrated her proficiency in narcotics detection in annual recertification exercises between 1980 and 1987.

Officer Eichmann was asked to have Coco examine the trooper's locker room at the Woodstown barracks for the presence or odor of a controlled substance. Officer Eichmann first took Coco on a "control run" or a "sterile run" of the locker room by leading her around the perimeter and past the locker and chest of drawers. On the "control run," Coco did not alert to anything. Officer Eichmann and Coco then left the locker room, and the pillowcase with the currency ... was hidden in a locker room chest of drawers. Upon her return to the locker room, Coco alerted almost instantly to the presence or odor of a controlled substance in the chest of drawers containing the pillowcase and currency. 727 F.Supp. at 157.

## ORDER

Accordingly, it is hereby ORDERED that Plaintiff's Motion to Strike and Motion for Summary Judgment are DENIED.

It is further ORDERED that Claimants' Motion for Summary Judgment is DENIED.

It is also ORDERED that the three known Claimants in this cause shall each have twenty (20) days from the date of this Order to file a verified claim stating an interest in the Defendant currency.